This Opinion is Citable as
Precedent of the TTAB

Mailed:
June 30, 2003

Paper No. 46
GFR

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————

**Trademark Trial and Appeal Board**

————

The NASDAQ Stock Market, Inc.
v.
Antartica, S.r.l.

————

Opposition No. 91121204
to application Serial No. 75/546,122
filed on September 1, 1998

————

Karol A. Kepchar and Chad T. O'Hara of Akin, Gump, Strauss, Hauer & Feld, LLP for The NASDAQ Stock Market, Inc.

Anthony S. Cannatella and Alessandro Saracina of Pavia & Harcourt LLP for Antartica, S.r.l.

————

Before Seeherman, Quinn and Rogers, Administrative Trademark Judges.

Opinion by Rogers, Administrative Trademark Judge:

Antartica, S.r.l., a corporation of Italy, has applied to register the mark set forth below, for the various goods also set forth below.

International Class 9: safety helmets for bicycling, motorcycling, and skiing;

International Class 25: sport clothing, namely, shirts, shorts, visors, hats, wind resistant jackets and pants, gym shorts, sweat shorts, sweat pants, sweatshirts, sweat socks, ski boots, apres-ski shoes and sports shoes;

International Class 28: sports goggles for use in swimming, skiing, motorcycling, motorcross, bicycling, basketball, running, squash, and racquetball; protective padding for playing soccer, football, skiing, and bicycling; skis; ski poles; snowboards; ski wax; ski bindings; stationary exercise bicycles; exercise weights; exercise benches; stationary cross-country ski machines; exercise treadmills; stair-stepping machines; exercise mats; and anti-vibration plates for skis and ski bindings.

The application is based on Section 44 of the Lanham Act, 15 U.S.C. §1126 and claims a priority filing date of July 14, 1998, based on the filing, on that date, of an Italian application to register the mark. An Italian registration for the mark has issued. A translation of the description of the mark in the Italian registration reads: "The Trademark consists of [the] word NASDAQ in block letters with tridimensional effect in grey colour, within a stylized red griffon." The involved application to register the mark in the United States does not include a translation statement or description of any kind.[1]

---

[1] In a motion made in this opposition to amend the mark, and subsequently withdrawn, applicant described the mark as consisting "of two elements: the term 'NASDAQ' and an accompanying design element consisting of the wings of a bird." Applicant also explained that "the term 'NASDAQ' is somewhat unique" and is an acronym for the Italian phrase "Nuovi Articoli Sportivi Di Alta Qualita," which applicant translates as either "new high quality sporting goods" (answer, ¶ 29) or "new sports products of high quality" (brief, p. 1). Further, applicant

**Opposition No.** 91121204

*THE PLEADINGS*

The NASDAQ Stock Market, Inc. has opposed registration of applicant's mark, asserting that it has operated, and continues to operate, The Nasdaq Stock Market; that opposer and its predecessors in interest have used NASDAQ "as a mark and a component of marks for gathering, processing and providing securities information to the financial industry and to the public and securities trading support services in connection with The Nasdaq Stock Market continuously in United States commerce since 1968" and continues to use NASDAQ "as a mark and component of marks for such services in the United States and elsewhere"; that "Nasdaq" is the distinctive part of opposer's trade name, which has been in continuous use in U.S. commerce since 1992, and that opposer, the general public, and members of the financial industry and media refer to opposer as "Nasdaq"; that listings for the "Nasdaq" stock market appear daily in publications and electronic media in the United States and throughout the world, and that opposer has promoted and advertised its "NASDAQ"[2] services throughout the world; and

stated that it considered NASDAQ unique for two reasons: first, "Applicant was unaware that the term 'NASDAQ' had ever been employed by anyone else"; second, "because in the Italian language there are no words that can end with the letter 'q,' Applicant believed that the term 'NASDAQ' would be particularly distinctive…."

[2] Opposer appears to utilize "Nasdaq" when discussing that term as an element of its trade name and "NASDAQ" when discussing that term as its trademark. We shall do the same.

that its websites www.nasdaq.com, www.nasdaqtrader.com, and www.nasdaqnews.com provide stock quotes, news reports and other financial information 24 hours a day, with its primary website, www.nasdaq.com being "the world's second most popular financial website."

Opposer also asserts that its promotional activities include the distribution and sale, by it or its licensees, of t-shirts, hats, jackets, golf balls, footballs, basketballs and baseballs bearing the "NASDAQ" mark; that its mark is famous "around the world" and well-known among the general public and within the financial industry; that its mark is a coined term with no descriptive or generic significance and, therefore, inherently distinctive; and that opposer has obtained a registration for NASDAQ on the Principal Register for "listing of securities for quotation for sale or information purposes" which is "valid, subsisting, incontestable and renewed."[3]

Opposer asserts that, in view of its registration, there is no issue as to priority in this case. In addition, opposer asserts that the verbal portion of applicant's mark is identical in sound, appearance and connotation to opposer's name and mark; that neither party's mark has denotative meaning; that the design element in applicant's

---

[3] Registration No. 922,973, issued October 26, 1971, first renewal term began October 26, 1991, second renewal term began October 26, 2001.

mark is insufficient to distinguish the parties' marks; and that the marks are confusingly similar in their overall commercial impressions. Opposer asserts that there are overlapping classes of purchasers from the general public and that those familiar with opposer and its services and ancillary goods would be likely to believe in error that applicant's goods are "sponsored, licensed or approved by" opposer. Thus, opposer asserts there exists a likelihood of confusion among consumers.

Finally, opposer asserts that its mark became famous long prior to the filing date of applicant's application, and that use of applicant's mark "will diminish and dilute the distinctive quality of Opposer's federally-registered 'NASDAQ' mark…."

Applicant, by its answer to the notice of opposition, admits that opposer operates The Nasdaq Stock Market; that listings for that stock market "appear daily in newspapers in the United States"; that the websites opposer claims to operate in fact exist; and that it filed the involved application and that both the filing date of the application by opposer to register NASDAQ and the issuance date of the registration based on that application predate the filing date of applicant's application. Applicant also admits that it has not yet used its mark in the United States and that both parties promote their goods and services over the

5

Internet.[4]  Otherwise, applicant has expressly or effectively denied the allegations of the Notice of Opposition.

Captioned as affirmative defenses are the following allegations:  that "NASDAQ" in applicant's mark "is an acronym" for "**N**uovi **A**rticoli **S**portivi **D**i **A**lta **Q**ualita" (emphasis in original) which, in English, means "new high quality sporting goods"; that opposer's pleaded registration does not encompass either the "ancillary goods" referred to in the notice of opposition or the goods listed in applicant's application and, therefore, "Opposer does not have the right to oppose Applicant's use of the Mark or the term 'NASDAQ' in connection with such goods and services"; and that opposer is barred by the equitable doctrines of laches, estoppel and/or acquiescence from opposing the involved application because opposer has known of applicant's use of the mark since at least as early as 1998 and "Applicant owns several existing registrations for the same (or substantially the same) mark for use in connection with the same (or substantially the same) goods and services."

---

[4] Applicant also admitted that copies of certain materials were attached to the Notice of Opposition.  This does not, however, stand as an admission of the authenticity of any of these materials and thus, the materials did not, by virtue of the admission, become part of the record.  See 37 C.F.R. §2.122(c) and discussion in TBMP Section 705.01.

Applicant's self-titled affirmative defenses are either mere amplifications of the reasons why applicant believes the opposition should be dismissed or, to the extent they may be properly cognizable affirmative defenses, they were not pursued and have not been discussed in the briefs. Accordingly, any properly cognizable affirmative defenses,[5] i.e., laches, estoppel and acquiescence, are deemed waived and will not be further discussed.

***THE RECORD***

The record includes opposer's notices of reliance on its pleaded registration; on applicant's responses and supplemental responses to opposer's requests for production[6]; on applicant's responses to opposer's first and

---

[5] To the extent that applicant intended to assert a *Morehouse* defense [Morehouse Manufacturing Corp. v. J. Strickland and Co., 407 F2d 881, 160 USPQ 715 (CCPA 1969)] by its reference to its "existing registrations," which we presume are registrations issued in countries other than the United States, we note that a *Morehouse* defense may not be based on ownership of registrations outside the United States. In addition, insofar as applicant has admitted that it has not used its mark in the United States, applicant's assertion of "laches, acquiescence and estoppel" would certainly appear to be inappropriate.

[6] It does not appear that applicant actually produced any documents in response to opposer's document requests. The notice of reliance states that opposer is relying on (1) responses to many requests that state that there are no responsive documents and (2) a declaration furnished as a supplemental response, by which the declarant states that some documents already produced are responsive to certain interrogatories and document requests and that no documents exist that are responsive to other requests. We read declarant's references to previously produced documents as references to documents produced in response to interrogatories under Fed. R. Civ. P. 33(d).

It is well-settled that documents produced in response to document requests may not be made of record by notice of reliance, unless otherwise qualified for introduction by such a

second set of interrogatories and documents produced pursuant to Fed. R. Civ. P. 33(d) in lieu of responses; on excerpts from printed publications; on applicant's responses to opposer's first and second set of requests for admission; on certain specified excerpts of the discovery deposition of John F. Jacobs, a non-party witness testifying as vice president of Reliable Racing Supply, Inc. (referred to by both parties and hereafter as "Reliable dep."); and a supplemental notice of reliance on printed publications. Opposer also took the testimony, during its main testimony period, of John L. Jacobs, a vice president of opposer, and of Anahi Pilarz, a manager in opposer's marketing department.

Applicant filed a notice of reliance on opposer's responses to interrogatories, including documents provided under Fed. R. Civ. P. 33(d). Applicant also, during its testimony period, took the testimony of William G. Shaw, a non-party witness, and a former chairman of an invitational skiing competition that has been sponsored by opposer.

---

notice. See 37 C.F.R. §2.120(j)(3)(ii). The rule, however, states that a party "which has obtained documents from another party … may not make the documents of record by notice of reliance alone…." It does not prohibit introduction of a response to a request for production that states that no responsive documents exist. In any event, neither party discusses the apparent absence of particular classes of documents in its brief and the "non-production" has had no bearing on our decision.

During the rebuttal trial period, opposer filed a notice of reliance on its supplemental responses to applicant's interrogatories, under 37 C.F.R. § 2.120(j)(5).

After rebuttal closed, opposer filed a request to substitute an "official copy" of a document previously submitted with one of opposer's timely-filed notices of reliance; and a copy of its requests for admission from applicant, the responses to which had been included with one of opposer's timely-filed notices of reliance. Applicant has not objected and we accept each proffer.

Prior to briefing, opposer filed the transcripts and exhibits of the testimony depositions of John L. Jacobs and Anahi Pilarz and exhibits 1-41. Applicant, however, did not file the transcript of the testimony deposition of its witness William Shaw. Opposer submitted a copy of that transcript with its reply brief.[7] A party cannot avoid the consideration of testimony it has taken by failing to submit it to the Board. 37 C.F.R. §2.123(h). Although it was applicant's responsibility to file the testimony deposition, in view of opposer's submission of the testimony, we need

---

[7] Opposer complains that applicant, apart from failing to file the transcript, did not arrange for its correction and signature by the witness. Nonetheless, correction and signature are technical objections to the transcript which should have been raised following its receipt and are considered to have been waived by opposer.

not insist on applicant's filing of a copy at this point. The Shaw testimony has been considered.

In regard to the Reliable discovery deposition, we approve the parties' pre-trial stipulation "to introduce as evidence" the deposition and their agreement that "any portion thereof may be introduced into evidence by either party for any purpose." We agree, however, with opposer's argument, set out in its reply brief on the case, that applicant, having failed to notice its reliance on any additional portions of the deposition, made improper references thereto in its discussion of the Reliable deposition in its brief. Accordingly, except to the extent that applicant has discussed excerpts already introduced by opposer, we have not considered those portions of the Reliable deposition discussed by applicant in its brief.

Neither party renewed, in any brief, objections interposed during the taking of testimony. Therefore, any such objections are deemed waived. Further, we note that we have credited testimony, exhibits, and materials submitted with notices of reliance with only whatever probative value is appropriate, even in the absence of objections.

**THE PARTIES**

Applicant

Applicant, not having taken any testimony from its own officers, board members, employees or the like, has offered

10

no direct testimony concerning its activities and background. In its brief, applicant asserts that it "is a well-known Italian company that has, since 1996, been engaged primarily in the research, manufacture and distribution of certain high-quality 'technical' athletic gear." Brief, p. 1.

Applicant submitted two product catalogues in lieu of a response to opposer's interrogatory no. 4, which requested applicant to identify "each of the products in connection with which Applicant's 'NASDAQ' mark is used."[8] One catalogue features the mark NASDAQ as a term standing alone and in conjunction with a design different from that in the mark in the involved application. This catalogue is entirely in Italian, and no translation has been submitted. Thus, it is of limited probative value. However, we note that on the cover overlaying the term NASDAQ, the catalogue displays the phrase "Nuovi Articoli Sportivi Di Alta Qualita." The goods featured in the catalogue appear to be

---

[8] Because we do not have a copy of opposer's interrogatories as originally served on applicant, we do not have the instructions and definitions. Thus, we do not know the definition of "Applicant's 'NASDAQ' mark." Because applicant's response refers to catalogues that show not the mark in the involved application but, rather, the term NASDAQ alone and NASDAQ with a different design (specifically, the NASDAQ and design mark that applicant attempted to substitute for the mark in the involved application), we have considered references to "Applicant's 'NASDAQ' mark" in discovery requests and responses to include any mark consisting in whole or in part of the term NASDAQ. Of course, the better practice is to submit the interrogatories, instructions and definitions therefor, and responses thereto, with the notice of reliance. See 37 C.F.R. §2.120(j)(3)(i).

casual athletic wear, i.e., t-shirts, sweatshirts, sweatpants, shorts and the like, along with a duffel bag and some sunglasses.  The catalogue is undated.

The second catalogue, the "Ski Stuff! Catalogue 2000/2001," is in English [an Italian version is also in the record] and features NASDAQ and the other composite NASDAQ and design marks.  Often, in this catalog, these marks are followed by the legend "by penguin," as in "NASDAQ by penguin."  The record, however, does not reveal to whom or what "penguin" refers, other than a name and/or mark of some company, which may or may not be related to applicant.  See applicant's responses to opposer's requests for admission, nos. 35, 38 and 40.  This second catalogue covers various ski helmets, shin, hand and arm guards, and ski plates, which apparently are for attaching to skis to obtain certain technical performance characteristics.[9]  This catalogue does not display the phrase "Nuovi Articoli Sportivi Di Alta Qualita" [nor does the Italian version of this catalogue].

Applicant has "temporary" webpages posted for www.nasdaq.it, www.nasdaqsport.net, and www.nasdaqsport.com, each of which displays a NASDAQ and design mark different from that in the involved application and the phrase "Il sito è in allestimento."  Opposer's request for admission no. 49 and exhibit B (reprints of the webpages) and

_____

[9] Reliable discovery deposition, p. 43.

applicant's response thereto.  We take the Italian phrase to translate roughly as "The site is under preparation."[10]  We note that the "temporary" webpages do not bear the phrase "Nuovi Articoli Sportivi Di Alta Qualita."

In its responses to certain requests for admission, applicant denies that it has sold any clothing or sporting equipment in the United States, but states its intention to do so.  Opposer's requests for admission nos. 27-30 and applicant's responses thereto.  In its response to opposer's interrogatory no. 20, applicant asserts annual sales revenue for "'NASDAQ' products" of approximately $3,000,000 (U.S.). Of course, as applicant has denied selling any products in the United States, we take this interrogatory response to reflect annual sales outside the United States, since 1996, i.e., applicant's asserted date of commencement of its manufacture and distribution of at least its ski gear.  In this regard, we also note the minutes of the April 12, 1998 meeting of applicant's shareholders (a copy of which, along with a translation from Italian, was produced with other documents in response to opposer's interrogatories), wherein applicant's shareholders apparently discussed the company's

---

[10] In an Italian-English dictionary we have consulted, "allestimento" is translated to mean "preparation."  A wire service report introduced by opposer via notice of reliance also quotes applicant's Italian counsel as stating that applicant's web sites "are still under construction" and that work on them has "been suspended."

strategic plan and budget for the five-year period from 1998-2002. In the minutes is a chart with sales projections for Europe and the United States. For Europe, sales of ski products are projected as follows: 3 million Euros (1998), 3.5 million Euros (1999), 4.5 million Euros (2000), 5 million Euros (2001) and 6.5 million Euros (2002). Again for Europe, sales of fitness wear are projected as 8 million Euros (1998), 9.5 million Euros (1999), 12 million Euros (2000), 15 million Euros (2001) and 18 million Euros (2002). There are no sales projected for the United States until 2001 and the record in fact reveals no sales have yet taken place in the United States. There is no way to tell from the record whether any 1996 and 1997 European sales were of ski products or of fitness wear, or both.

Opposer

The testimony of John L. Jacobs, opposer's senior vice president of worldwide marketing and financial products[11], provides background concerning opposer's formation and role in the securities industry. The following background is gleaned from the Jacobs testimony deposition, unless indicated otherwise.

Opposer was originally organized by the National Association of Securities Dealers. In the 1960s, the United

---

[11] Jacobs is also president and CEO of NASDAQ Financial Products Services, Inc., a wholly-owned subsidiary of opposer.

States Congress had determined that "there should be an alternative way to trade securities not listed on The New York or The American Stock Exchange[s]." Congress authorized the Securities and Exchange Commission to look into the matter. Eventually, the National Association of Securities Dealers (NASD) was "tasked with that mission." Jacobs test. dep. pp. 13-14.

The decision was made not to create an auction style or order-driven market in a physical location but to create an automated market utilizing telecommunications and a quotation-driven system. By 1968 or so, the concept of the National Association of Security Dealers Automated Quotation system was formed. The first day of trading was February 8, 1971. In its early days, the market was often referred to as the "over-the-counter" market because it was concerned with trading in companies not listed on the New York and American stock exchanges and trading in interests in such companies were typically referred to as "over-the-counter" transactions. See, generally, excerpts from printed publications submitted under opposer's notice of reliance. In 1975, listing standards for companies were promulgated.

Opposer generates revenue for itself in four primary ways: First, it gets paid for transactions of investors and traders who use a NASDAQ facility or system, paying on a per transaction or subscription basis. Second, opposer packages

data from various sources, including transactions in its own markets, and sells the information to consumers and investors. Third, "whether it's Microsoft… or the latest IPO," companies pay fees to be listed on the NASDAQ stock market. Fourth, opposer licenses use of the NASDAQ name for use on or in connection with other financial products and services. An example of a licensing arrangement is The NASDAQ 100 Index Tracking Stock. That is an investment vehicle focusing on 100 NASDAQ-listed companies.

By 1994, more domestic and foreign companies were listed on the NASDAQ stock market than on all other United States stock markets combined. Also by 1994, the NASDAQ stock market had surpassed the New York Stock Exchange and become the leading stock exchange in terms of share volume. In 1997, the NASDAQ stock market became a hybrid market utilizing both orders and quotes. In 1999, the NASDAQ stock market became the leading stock exchange in terms of dollar volume.

Opposer has been involved in joint ventures with other securities markets in Hong Kong, Japan and London. Opposer's website, www.nasdaq.com, was launched in April 1996. It includes financial news, investment tracking tools, stock quotations – including for stocks listed on markets other than opposer's - and the like. Many of the tools assist consumers with issues not directly related to

the stock market, such as mortgages and retirement planning. The nasdaq.com website generates high traffic, from visitors both inside and outside the United States, serving up 7 million page views per day.  Opposer also has a separate website, www.nasdaqtrader.com, for professional investors and traders.

Since 1997, opposer has maintained a formal University Outreach program, whereby it distributes information and brochures on the stock market to schools, professors and students.  Opposer began running television ads in 1991 and aired some in at least every year from 1996 on.  It started measuring awareness of its brand in 1990 and charted an increase in awareness through a decade of paid advertising, distribution of premiums and gifts, hosting of events, sponsorship of events and broadcasts, direct marketing, media relations, and public relations.  Though the amount is confidential, opposer has spent very significant sums on these activities, by any measure.

The primary target group for opposer's advertising is men, 35 to 64, with at least a $75,000 annual income. Opposer has found that sports programming is the best way to reach them.  The NASDAQ-sponsored half-time report during professional football broadcasts began at least as early as the 1997-98 football season.  Opposer was a sponsor of the televised 1997 Senior Skins Game (a golf tournament), and

17

has been a sponsor of the Big 10 college basketball tournament. At least as early as the 1997-98 season, it sponsored broadcasts of NCAA college football.

To compete with the media exposure the New York Stock Exchange receives for its ceremonial daily openings and closings on its trading floor, opposer, which does not have a trading floor, opened the "MarketSite" in its downtown New York City offices in 1997. The facility was developed as a place to take issuers, i.e., NASDAQ-listed companies, and as a setting from which reporters could broadcast news of the NASDAQ market. Opposer, however, felt the downtown location and lack of access to the public were drawbacks. Thus, opposer planned and opened a new MarketSite in New York City's Times Square. Mr. Jacobs [test. dep. p. 94] explained the motivation behind the move as follows:

> It was a huge departure for a stock market to go to Time[s] Square, but it was clearly in light of our mission. We were looking at 2 million international, high-net-worth mostly individuals going through Time[s] Square every year. So what we looked at is we were positioning ourselves among main stream. You've got a lot more people going, going to plays and different places, and it was the international audience. The international audience that goes through Time[s] Square has to have money to go there. We were going to be smack dab in the middle of it all.
> We had this video wall on the outside which is the largest video wall at the time. That's the picture right here [referring to an exhibit]. Obviously, it's NASDAQ, and even down to walking on the sidewalk, everything says NASDAQ, NASDAQ, NASDAQ. So you can't miss it if you're in site [sic-sight] that this is NASDAQ.

18

The Times Square MarketSite large video wall was operational for New Year's Eve 1999, and the site has hosted numerous televised market openings by celebrities and sports figures.

Opposer's distribution of collateral products branded with its NASDAQ mark was the subject of testimony by Anahi Pilarz, a manager in opposer's marketing department, and to a lesser extent, by Mr. Jacobs.  This will be discussed <u>infra</u>, as will other evidence, in conjunction with our consideration of opposer's claims.

### PRIORITY AND LIKELIHOOD OF CONFUSION

<u>Priority</u>

Opposer essentially has made two claims under Section 2(d) of the Lanham Act.  First, opposer claims that the registered mark NASDAQ is famous, incontestable, and has been so widely promoted for the registered services, various other financial services and through use on collateral promotional items, in sponsoring sporting events (or broadcasts of the same), and for various types of academic competitions, course offerings and the like, that applicant's use of its NASDAQ and design mark would be likely to cause confusion among consumers.  Second, opposer claims that its use of the NASDAQ mark on collateral promotional items, followed by subsequent sales of such branded items, yields opposer actual priority of use on

19

goods that are similar to those identified in applicant's involved application. Under both these claims, opposer essentially is asserting that prospective purchasers of applicant's goods will believe that they emanate from, or are somehow approved by, opposer.[12]

We agree with opposer's argument that priority is not an issue insofar as the first of these two claims is concerned, as opposer has introduced into the record a certified copy of its pleaded registration showing that it is valid and subsisting and that title is in opposer. King Candy Company v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974); Carl Karcher Enterprises Inc. v. Stars Restaurants Corp., 35 USPQ2d 1125 (TTAB 1995). However, insofar as opposer, by its second claim, is asserting that it has acquired superior proprietary rights in NASDAQ for goods such as "t-shirts, hats, jackets, golf balls, footballs, basketballs and baseballs" (Notice of Opposition, ¶ 9), and that applicant's use of the involved NASDAQ and design mark for closely related goods would be likely to cause confusion, proof of the acquisition of the

---

[12] Opposer's Section 2(d) claims are, of course, related, insofar as each relies on use of the NASDAQ mark on goods which are asserted to be in part the same as, and otherwise closely related to, the identified goods of applicant. But it is the nature of opposer's use of its mark on such goods that varies with the claim, one claim involving use on these goods as an activity collateral to the operation of the stock market and the other claim asserting use in such a manner as to create superior rights in opposer even apart from its operation of the stock market and activities related thereto.

superior proprietary interest must be shown. Otto Roth &
Company, Inc. v. Universal Foods Corporation, 640 F.2d 1317,
209 USPQ 40, 43 (CCPA 1981) ("the opposer must prove he has
proprietary rights in the term he relies upon to demonstrate
likelihood of confusion as to source, whether by ownership
of a registration, prior use of a technical "trademark,"
prior use in advertising, prior use as a trade name, or
whatever other type of use may have developed a trade
identity."). Accordingly, we have examined the record to
see what it reveals about opposer's distribution of goods
such as "t-shirts, hats, jackets, golf balls, footballs,
basketballs and baseballs."

Mr. Jacobs testified at length about events opposer has
sponsored and which served as the means for distribution of
NASDAQ-branded products. There was testimony about the
Directors Invitational Ski Classic, an invitation-only event
for business people to which opposer, by virtue of its
sponsorship of the event, was able to invite officers,
directors and the like from NASDAQ-listed companies.
Participants competed in teams led by guest professional
skiers.[13] Mr. Jacobs also testified about opposer's
participation in a ski tournament for teams from different
stock markets; opposer's sponsorship of Women's Tennis
Association events; opposer's distribution of NASDAQ-branded

---

[13] Mr. Shaw's testimony discussed the ski event at length.

21

baseballs through a joint venture with Major League

Baseball's Cleveland Indians; and opposer's sponsorship of a

golf tournament known as "The Senior Skins Game." Testimony

on each of the sponsored events included explanation by Mr.

Jacobs of premiums and other items distributed to

participants or observers. Mr. Shaw, too, testified about

distribution of items at the ski event. Finally, Mr. Jacobs

testified concerning distribution of a wide variety of

collateral merchandising items illustrated by opposer's

exhibits 20 and 22. He deferred to Ms. Pilarz in regard to

when opposer began selling such items through its

www.nasdaq.com website and its MarketSite store.

Ms. Pilarz testified that, in 1995, she became the

"main person" although not the only one responsible for

opposer's purchases of NASDAQ-branded merchandise, for

subsequent distribution and/or sale. Ms. Pilarz testified

that the Nasdaq MarketSite store opened in February 2000 and

the nasdaq.com online store opened in September of 2000.

Pilarz, pp. 5-6.

Mr. Jacobs testified that Nasdaq did not sell NASDAQ-

branded merchandise other than through "the NASDAQ store"[14]:

"No. We gave it away." Jacobs, p. 151. That would mean

opposer did not sell such items prior to some time in the

---

[14] We take this to mean both the MarketSite store and the
www.nasdaq.com online store.

year 2000. In contrast, Ms. Pilarz testified that opposer has both sold such items and distributed them without cost since she joined opposer in 1991. Moreover, she testified that the products in exhibit 22, e.g., t-shirts, windshirts, zip-front pullovers, gym shorts, golf towels, golf ditty bags, polo shirts, socks, turtlenecks, sweaters, sweatshirts, fleece vests, binoculars, dartboards, and baseball hats, are representative of the products that have been sold and distributed during her tenure. Pilarz, pp. 8-9. Ms. Pilarz also recounted one instance whereby opposer sold hats to a broker-dealer to give to customers, although she did not state when this occurred. Pilarz, p. 11.

Finally, Ms. Pilarz testified about the existence of "a store at the K Street [Washington, DC] office. It was a retail store with a cash register, and we sold hats, pens, T-shirts, sweatshirts, different types of wearables, sporting things, and that store was there because of demand." Pilarz, p. 112. From 1991 through some time between 1996 and 1998, any visitor or company employee could purchase items, and even after the store closed because of construction at that address, employees could still make purchases of gift items from a fellow employee of opposer, which "happened quite a bit." Ms. Pilarz testified that she made a number of purchases in this manner. Pilarz, pp. 113-115.

"[T]he challenger's burden of proof in both opposition and cancellation proceedings is a preponderance of the evidence." Eastman Kodak Co. v. Bell & Howell Document Management Products Co., 994 F.2d 1569, 26 USPQ2d 1912, 1918 (Fed. Cir. 1993), citing 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, Section 20.16 (3d ed. 1992). Opposer has failed to meet this burden in its attempt to show, without regard to its federal registration for NASDAQ for stock market services, that it made prior use of NASDAQ for goods such as those identified in applicant's application, or for opposer's collateral products that are closely related thereto.

We do not, by this finding, mean to imply that opposer's proof fails because it largely deals with give-aways and premiums bearing the NASDAQ mark, as opposed to the sale of such goods (which did not begin in earnest until after applicant's priority filing date).[15] It is, instead, the vague or imprecise nature of the Jacobs and Pilarz testimony that prevents opposer from meeting its burden of proof. While Mr. Jacobs was expansive in his testimony regarding distribution of branded products at sponsored

---

[15] Though applicant argues against the sufficiency of give-away NASDAQ promotional goods to establish trademark rights, applicant itself appears to recognize the advantages of such a practice in creating brand awareness: "We also enjoy the support of many so-called VIPs, to whom we will be supplying casual wear items, to create a trend." Minutes of applicant's April 12, 1998 Board meeting.

sporting events, he generally did not testify to specific dates so as to establish that NASDAQ-branded ski goods, tennis goods, golf goods, or baseballs were distributed prior to applicant's filing date.[16]  Likewise, while the testimony of Ms. Pilarz that NASDAQ-branded products were both sold and distributed from 1991 on is unequivocal, the testimony is vague concerning actual distribution; and the exhibits to testimony corroborate purchases by opposer, not from opposer.[17]  Opposer has failed to prove its Section 2(d) claim only insofar as it is based on opposer's assertion of priority of use of NASDAQ for collateral products and premiums that are the same as or closely related to the goods in applicant's application. Nonetheless, we find nonetheless that the record establishes that opposer's use of its mark for collateral goods, and in connection with its sponsorship of various events, including

---

[16] One exception was his testimony that opposer sponsored The Senior Skins Game golf tournament in 1997, i.e., prior to applicant's priority filing date.  However, during cross-examination in regard to his testimony about The Senior Skins Game golf tournament, Mr. Jacobs admitted he tends to generalize and could not be specific about items distributed at the event. Jacobs, pp. 249, 251.

[17] The spreadsheet that is Jacobs/Pilarz exhibit 25 evidences only some purchases of branded items in 1998 prior to applicant's priority filing date; most of the spreadsheet covers purchases made later.  However, for the 1998 purchases to aid opposer's attempt to prove priority, we would have to infer that opposer very quickly distributed the purchased items.  While we have been presented testimony on how orders from within opposer for NASDAQ-branded premiums and collateral products are processed and filled, we have no testimony concerning how quickly or routinely opposer distributes such items after they have been received.

athletic events and broadcasts, has been a natural outgrowth of its business, has expanded over time, and contributes, as discussed below, to our finding of likelihood of confusion in regard to opposer's Section 2(d) claim based on its pleaded registration.

Likelihood of Confusion

We analyze the issue of likelihood of confusion using the factors that were articulated by one of the predeceesors of our primary reviewing court, the Court of Customs and Patent Appeals, in the case of In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 1361, 177 USPQ 563, 567 (CCPA 1973).  See also Recot, Inc. v. Becton, 214 F.3d 1322, 54 USPQ2d 1894, 1896 (Fed. Cir. 2000).

"The likelihood of confusion analysis considers all *DuPont* factors for which there is evidence of record but 'may focus ... on dispositive factors.'"  Hewlett-Packard Co. v. Packard Press Inc., 281 F.3d 1261, 62 USPQ2d 1001, 1003 (Fed. Cir. 2002) (citations omitted).

1. The Marks

The similarity or dissimilarity of the marks, a key factor, is assessed by comparing the marks as to appearance, sound, connotation and commercial impression.  Herbko International Inc. v. Kappa Books Inc., 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002).  Opposer's mark, as registered, consists solely of the term NASDAQ.  As used, it

is almost universally set forth in plain block letters; only occasionally is it used in conjunction with a globe design. Applicant's mark, in the involved application, consists of the same term, NASDAQ, set forth in a block letter format. There is also a stylized representation of what may be a griffon (as described in the Italian registration that serves as the basis for the involved application) or an eagle with open wings (applicant's brief, p. 3).[18] Regardless of what the design element represents, we view it as highly stylized and as not possessed of any particular, unmistakable connotation. In other words, in considering the contribution the design makes to the mark, it may depend on the individual viewing the mark.

Applicant asserts in its brief that it first used "[t]he Italian phrase and its appropriate acronym together with the eagle design… in Europe… in 1998 and… has continued to do so since." Brief, p. 4. Apart from the fact that there is, however, nothing in the record that shows use of the phrase, acronym and design together, the mark in the involved application does not include the Italian phrase.

---

[18] Applicant did not include a description of its mark in the involved application, but appears not to consider the design element to represent a griffon, notwithstanding the description in its Italian registration. See, in this regard, applicant's withdrawn motion to amend its mark, wherein it described the design element of its mark as consisting of the wings of a bird and asserted that applicant desired to associate its goods with "speed, precision, power and grace, attributes which are naturally associated with an eagle or falcon in flight."

Thus, we do not consider the Italian phrase as making any contribution to the connotation of applicant's composite mark, or to the individual components thereof, i.e., the acronym and griffon or eagle design.

Opposer's mark is an acronym for the phrase National Association of Securities Dealers Automated Quotations. Jacobs, p. 15. Opposer's supplemental notice of reliance under 37 C.F.R. § 2.122(e) of January 30, 2002.[19] Opposer's vice president (Jacobs) testified, however, that opposer does not use the full phrase, favoring instead just NASDAQ, which has "become part of the common lexicon." Jacobs, pp. 37-39. In fact, the voluminous NEXIS article excerpts and other printed publications made of record (Opposer's notice of reliance under 37 C.F.R. § 2.122(e) of January 7, 2002) show that the vast majority of references to opposer's stock market are to NASDAQ alone.

Apart from the many public references to opposer's mark that have appeared in printed publications, opposer has done a great deal of advertising of its stock market and the types of companies that are listed on its market. While the specific outlets and amount spent are confidential, we can state that opposer has extensively advertised its stock market on radio, on cable and broadcast television, and in

---

[19] Some of the reference works use Quotations, others use Quotation System.

28

print.  Jacobs confidential testimony, pp. 50-88; see also tape of television ads submitted as exhibit 13.[20]  Opposer promotes its stock market as innovative and a more efficient market that utilizes technology.  See, e.g., Jacobs exhibits 16 and 19.  As an example, opposer utilizes the tag lines "Stock Market For The Digital World" and "The Stock Market For A Digital World."  Id.  In addition, the growth of opposer's market has in large part been accomplished by gaining listings of high-technology companies.  Jacobs, pp. 42-45.

The connotation of opposer's NASDAQ mark, both as registered for its stock market services and as used on or in conjunction with its collateral products, is that of a technology-laden and technology-driven stock market different from older, more traditional markets.  The overall commercial impression of opposer's mark is that of an inherently distinctive mark.

To the extent they would be pronounced, as in radio advertising or in conversation, opposer's and applicant's marks are identical.  Visually, they are virtually identical, for we do not find that consumers of applicant's product are likely to place great emphasis on the amorphous,

---

[20] Opposer, in its brief, which is not confidential, asserts that it has spent "in excess of $200 million on direct advertising." Brief, p. 12.  The confidential portions of the record support the claim.

29

stylized design of a winged creature which frames the bold letters NASDAQ.

While applicant argues that its mark has a connotation distinct from that of opposer's mark, we find little in the record that would support the conclusion that it has any particular connotation.  For prospective consumers of applicant's products, or individuals who see others using or wearing these products, and who are unaware of opposer and its mark, both opposer's mark and applicant's mark will likely be perceived as arbitrary and have no particular connotation.  For these consumers the overall commercial impressions of the respective marks would be the same. However, to the extent prospective consumers of applicant's products, or those who see applicant's products being used or worn by others, are aware of opposer's mark, we find these individuals are likely to ascribe to applicant's mark the same connotation as they would to opposer's mark.[21]  For these consumers, too, the overall commercial impressions of the marks will be the same.  The only difference between those who are familiar with opposer's mark and those who are not, is that those who are familiar with it will have a definite connotation come to mind, while those who are not

---

[21] We note, too, that applicant's 2000/2001 ski catalogue, to the extent it is indicative of the way in which applicant will promote its International Class 9 and International Class 28 goods, promotes the products as the marriage of "innovative solutions and materials."

familiar with it will consider both opposer's and applicant's marks to be arbitrary and may not ascribe any particular connotation to the marks. Even if applicant were to promote its products under the Italian phrase that is asserted to be the derivation of applicant's NASDAQ mark, the significance will likely be lost on United States consumers who are not familiar with Italian.

In sum, the marks are identical in sound and virtually identical in the visual and connotative impressions they create, a factor that weighs heavily against applicant. In re Majestic Distilling Co., 315 F.3d 1311, 65 USPQ2d 1201, 1204 (Fed. Cir. 2003); In re Martin's Famous Pastry Shoppe, Inc., 748 F.2d 1565, 223 USPQ 1289, 1290 (Fed. Cir. 1984).

2. Fame of Opposer's Mark

On the record before us, we cannot but conclude that opposer's mark is famous for its stock market services. Opposer engaged in television, radio and print advertising on a large scale throughout the 1990s. Its website receives 7 million page views per day; and 2 million people pass by its MarketSite facility in Times Square every year. Throughout its decade-long advertising campaign, opposer commissioned annual surveys to measure the level of awareness of opposer's stock market among the investing and general public. The result -- "of [the] hundreds of millions [opposer has] spent" on "advertising, premiums,

gifts" -- has been an increase in awareness of opposer's stock market among investors from just above 20 percent in 1990 to more than 80 percent in 1999. See, in regard to the advertising campaign and survey effort, Jacobs, pp. 170-183, and exh. 28.

Tables for stocks listed in opposer's stock market have appeared in newspapers throughout the United States since February 1972. The market's daily results appear in hundreds of newspapers, are reported on television, and are posted on numerous web sites. Jacobs, pp. 194-96. Considering the excerpts of printed publications submitted by opposer, there have also been countless articles published which discuss the NASDAQ stock market or "NASDAQ-listed" companies.

See, as examples of articles about listed companies, the following:

> When a company has a hot [oil/gas] well on tap, speculative fever can put the stock on NASDAQ's most-active list. Forbes magazine, December 15, 1976.

> The recent growth of the six-year-old firm has already earned it approval in May to trade its common stock on the NASDAQ stock exchange (under the symbol TLOG). Arizona Business Gazette, June 30, 1986.

> I own shares of Advanced Genetic Sciences Inc., listed with NASDAQ stocks. I have read that the company…. The Boston Globe, November 27, 1988. [from a question from a reader answered in a column for investors].

32

"There is a level of credibility that relates to NASDAQ membership, and losing it would have a very detrimental effect on my company," said Irwin Bosh Stack…. St. Petersburg Times, May 14, 1990.

MICROSOFT, NASDAQ BECOME CLOSER
  Microsoft's chief financial officer, Mike Brown, was named chairman of the Nasdaq Stock Market's board of directors last week.
  The move further cements Microsoft's relationship with Nasdaq, in the face of attempts by the New York Stock Exchange to woo the stock-rich company. The Seattle Times, March 31, 1997.

Many articles have specifically focused on the market itself, how it operates, its advertising and competition with other markets, its joint ventures, and its expansion abroad. See, for example:

[Bunker Ramo Corp.] realized $46 million in gross income from its facilities management of the NASDAQ over-the-counter stock quotation system and from quotation services for listed securities and commodities. The American Banker, September 12, 1979.

The London Stock Exchange's governing council said today that it had approved a new stock trading system that would create a market closely resembling the Nasdaq national system in the United States. The New York Times, July 20, 1984.

To get onto Nasdaq, a company must…. … Nasdaq estimates that 2,100 of its stocks… Nasdaq volume in January slackened…. [The NASD president] said that visits have been made to the chief executives of the large Nasdaq companies to comfort them and persuade them to stick with the market. The New York Times, February 14, 1988 [lengthy article on opposer's operations].

A new ad hit the airwaves Sunday from the National Association of Securities Dealers, home of NASDAQ over-the-counter stocks. NASDAQ's latest TV ad gives a capsule history of MCI Corp., one of the biggest companies listed on NASDAQ. The campaign

now focuses on companies investors can buy on the NASDAQ stock market, as opposed to the more general "What is NASDAQ?" ads that have aired up to now. <u>USA Today</u>, January 30, 1992.

GAO LAUDS NASDAQ FOR IMPROVEMENTS
The Nasdaq Stock Market is doing a better job of checking out listing applicants and making sure listed companies comply with its standards, according to Congress' General Accounting Office. <u>The Los Angeles Times</u>, April 30, 1999.

S.F. Firm Grabs Piece of Nasdaq
Hellman & Friedman… has acquired a 9.8 percent interest in the Nasdaq Stock Market for $240 million. <u>The San Francisco Chronicle</u>, March 29, 2001.

Even when opposer's stock market has had troubles, it received publicity. See Jacobs, pp. 46-49 ad 180. See also:

New rules aimed at making the Nasdaq stock market a fairer place for individual investors won approval yesterday from the Securities and Exchange Commission. Both rules were proposed by the National Association of Securities Dealers, which runs the screen-based Nasdaq. <u>The Boston Herald</u>, June 30, 1994.

SEC reviewing day trading
…day trading, in which thousands of investors make rapid-fire stock trades through firms with immediate electronic access to the Nasdaq Stock Market. <u>Milwaukee Journal-Sentinel</u>, February 28, 1999.

…when the Nasdaq stock market made its famous 1,000-point roundtrip… it had dropped – and recovered – 500 points. <u>San Jose Mercury News</u>, July 31, 2000 [from article recounting a particularly volatile day for the market].

All the foregoing and many other article excerpts were submitted with Opposer's notice of reliance under 37 C.F.R. § 2.122(e) of January 7, 2002.

The fame of opposer's mark is particularly significant. It extends beyond the stock market services identified in opposer's registration and opposer's mark is "accorded more protection precisely because [it is] more likely to be remembered and associated in the public mind." Recot, 54 USPQ2d at 1897 (Fed. Cir. 2000) citing Kenner Parker Toys, Inc. v. Rose Art Industries, Inc., 963 F.3d 350, 22 USPQ2d 1453, 1457 (Fed. Cir. 1992) and Specialty Brands, Inc. v. Coffee Bean Distribs., Inc., 748 F.2d 669, 675, 223 USPQ 1281, 1284 (Fed. Cir. 1984). See also, Bose Corp. v. QSC Audio Products Inc., 293 F.3d 1367, 63 USPQ2d 1303 (Fed. Cir. 2002) (Public discussion of trademarked product provides confirmation of context of use of mark and evidence that efforts to promote marked product have been successful).

"This reasoning applies with equal force when evaluating the likelihood of confusion between marks that are used with goods that are not closely related, because the fame of a mark may also affect the likelihood that consumers will be confused when purchasing these products." Recot, 54 USPQ2d at 1897.

"Although fame alone cannot overwhelm the other *DuPont* factors as a matter of law, see University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., Inc., 703 F.3d 1372, 217 USPQ 505 (Fed. Cir. 1983), fame deserves its full measure of weight in assessing likelihood of confusion." Id. at 1898.

Based on the size of opposer's stock market, the level of investor recognition, and the frequent, indeed daily, coverage the market receives in the media, we find opposer's mark famous and find that this *DuPont* factor weighs heavily in favor of a finding of likelihood of confusion.

### 3. Goods and Services; Involved Consumers

Another key *DuPont* factor in the analysis of likelihood of confusion is the relatedness of the involved goods and services. Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976). Moreover, "the greater the degree of similarity in the marks, the lesser the degree of similarity that is required of the products or services on which they are being used in order to support a holding of likelihood of confusion." In re Concordia International Forwarding Corp., 222 USPQ 352, 356 (TTAB 1983). See also, In re Shell Oil Co., 992 F.2d 1204, 26 USPQ2d 1687, 1689 (Fed. Cir. 1993) (Contemporaneous use of identical or nearly identical marks can lead to the assumption that there is a common source "even when [the]

36

goods or services are not competitive or intrinsically related.")

Opposer's stock market services are, per se, very different from applicant's identified goods. The record, however, is very clear that opposer has engaged in extensive advertising and promotion of its mark. A great deal of the promotion, especially television advertising, has involved associating opposer with companies that are listed on opposer's stock market, and by derivation, the products and services of those companies, insofar as in its radio and television advertisements opposer portrays itself as aiding the growth and development of these companies and the marketing of their products and services. Jacobs exh. 13. In addition, opposer has been the sponsor or backer of numerous sporting events or broadcasts of the same; academic conferences and competitions; maintains often-visited websites which offer much information and software tools distinct from operating a stock market; produces a widely distributed magazine; and has distributed and sold a wide variety of promotional products. Finally, notwithstanding that we have previously concluded that the record created by opposer falls short of establishing both (1) use by opposer of its mark on *particular* types of promotional items and (2) distribution or sale of such items *prior to* July 14, 1998, we have no doubt, on this record, that opposer's use of

NASDAQ-branded promotional items or premiums to promote its business is a long-standing practice.

In regard to this last point, applicant argues that opposer's promotional products, at least until its retail MarketSite and website stores were open, were generally given away and did not travel in the customary channels of trade for goods such as those identified in applicant's application. Brief, p. 14. In addition, applicant argues there is nothing in the record to show that opposer "intends to become known as a designer, manufacturer or distributor of any of the ancillary promotional items" and these primarily promote opposer's stock market. Brief, p. 15.

"We hasten to [note] that the mere fact that a collateral product serves the purpose of promoting a party's primary goods or services does not necessarily mean that the collateral product is not a good in trade, where it is readily recognizable as a product of its type (as would be the case with T-shirts, for example), and is sold or transported in commerce. See, for example: In re Snap-On Tools Corp., 159 USPQ 254 (TTAB 1968) [ball point pens which are used to promote applicant's tools, but which possess utilitarian function and purpose, and have been sold to applicant's franchised dealers and transported in commerce under mark, constitute goods in trade], and In re United Merchants & Manufacturers, Inc., 154 USPQ 625 (TTAB 1967)

38

[calendar which is used as advertising device to promote applicant's plastic film, but which possesses, in and of itself, a utilitarian function and purpose, and has been regularly distributed in commerce for several years, constitutes goods in trade]." Paramount Pictures Corp. v. White, 31 USPQ2d 1768, 1773 (TTAB 1994). Further, we note that use of trademarks on collateral products has become quite common. See Turner Entertainment Co. v. Nelson, 38 USPQ2d 1943 (TTAB 1996) and authorities discussed therein.

We conclude that countless individuals -- from market traders to individual investors; those employed by or directing "NASDAQ-listed" companies and those doing business with them; academics, students and sports fans -- have been exposed to opposer's NASDAQ mark and to its use on or in conjunction with collateral products and as an indicia of opposer's sponsorship of a wide variety of events. We also conclude that, under these circumstances, individuals familiar with opposer, its services, collateral products and event-sponsorship activities, when confronted with applicant's mark used on at least some of its identified goods, will consider such goods either to be promotional items of opposer or products branded with opposer's mark in conjunction with opposer's sponsorship of an event.

Applicant has argued that its goods are technically advanced products that will be marketed only to

39

sophisticated professional and amateur athletes.  We note, however, both that the identification of goods lists such commonplace products as bicycling helmets, gym shorts and sweat socks, and exercise mats, and that these items would not necessarily be purchased by sophisticated athletes. Even in regard to applicant's ski products, its "Ride" model ski helmet (see 2000-2001 Ski Stuff catalogue) is designed for simplified use by "children and young people." Moreover, the channels of trade are not limited, so our analysis of likelihood of confusion must assume that the goods will be marketed to all possible consumers.  Octocom Systems Inc. v. Houston Computers Services Inc., 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990).

Applicant also argues that we should consider opposer's stock market services as being marketed only to corporate executives who are deciding on what stock exchange their companies will be listed.  We disagree.  The record certainly makes it clear that, in administering its stock market, a significant class of customers is corporate executives and listed companies; but individual purchasers of stocks are also customers, even if, as applicant asserts, they make stock purchases through brokers.

4. Applicant's Intent in Adopting NASDAQ

Applicant asserts it only became aware of opposer's mark as the result of a search report from Italian counsel

40

dated June 29, 1998. Response, opposer's interrogatory no. 11. That assertion is, at best, inaccurate. The minutes of the meeting of applicant's Board on April 12, 1998 show that the Board had earlier "called a tender among various professionals to conceive a new trademark" [a fact the shareholders were reported to be aware of] "due to certain problems arisen with the 'NAFTA' brand name," and that the Board *had already chosen* [emphasis added] the new mark NASDAQ to replace NAFTA.[22] The minutes go on to report "advisors confirmed the possibility to file such trademark [NASDAQ] without encountering any conflict. In certain cases the index of the U.S. online stock exchange is filed in Category 9, which is totally compatible with our activity." Thus, though applicant asserts that it did not become aware of opposer until June 29, 1998, it appears clear from the record that applicant had actually discussed the availability of the mark, in the specific context of opposer's mark, with certain advisors prior to applicant's April 1998 Board meeting.

We also note that applicant's responses to opposer's requests for admission nos. 4 and 9 are in direct conflict. In response to the former, applicant *admitted* that it "conducted a U.S. trademark investigation prior to using

---

[22] Shareholders were informed they could review the other candidates besides NASDAQ, but the minutes do not mention what other candidates there were.

"NASDAQ" as a trademark," while in response to the latter, applicant *denied* knowledge of opposer's use of NASDAQ at the time applicant adopted its NASDAQ mark. It appears applicant is attempting to portray itself as a company that investigates a mark before using it, yet it claims not to have been aware of opposer's prior use of NASDAQ when it adopted the same mark.

Opposer implies that applicant's earlier use of NAFTA, as evidenced by applicant's Board meeting minutes, coupled with its switch from NAFTA to NASDAQ, is evidence of applicant's bad faith intent to capitalize on well-known acronyms.[23] Opposer would also have us rely on both a statement of applicant's Italian counsel regarding the "technological feel" of NASDAQ (opposer's notice of reliance under 37 C.F.R. §2.122(e) of January 7, 2002)[24], and on the "concocted… acronymic significance" (brief, p. 14) of NASDAQ as used by applicant, as evidence that applicant is a free rider.

---

[23] We take judicial notice that NAFTA is the acronym for North American Free Trade Agreement. See authorities collected in TBMP §712.01.

[24] Various items submitted under this notice of reliance, including the article which includes the quote from applicant's counsel, would not normally be admissible by notice of reliance. However, because applicant has not objected to any of these submissions, we have treated all attachments to the notice of reliance as properly of record, whether or not they are of probative value. Jeanne-Marc, Inc. v. Cluett, Peabody & Co., Inc., 221 USPQ 58 n.4 (TTAB 1984).

In determining whether applicant adopted its mark in good faith, or in bad faith intending to benefit from the renown of opposer's mark, we decline to rely on the hearsay statement of applicant's counsel. Nonetheless, we find applicant's choices in marks curious and agree that the purported significance of NASDAQ appears concocted. For example, though adoption of NASDAQ was discussed during applicant's Board meeting, no mention is made of what the term stands for. Further, applicant's discovery responses are contradictory and evasive.

In sum, however, we do not find this record supports, by a preponderance of the evidence, a conclusion of bad faith adoption. In this regard, we note that applicant's counsel gave applicant clearance to proceed with the filing of its Italian and U.S. applications. We do not believe that applicant can be faulted for following the opinion of its counsel, especially in view of the settled principles that (1) mere prior knowledge of another's mark does not establish bad faith adoption and (2) the presumption of an exclusive right to use extends only so far as the goods or services listed in a registration [and those within a registrant's natural scope of expansion].[25] See, in regard

---

[25] While we cannot say that applicant, once it became aware of opposer, had a duty to engage in further investigation regarding any collateral use or expansion by opposer before filing its applications, it certainly would have been prudent.

to the former, <u>Sweats Fashions Inc. v. Pannill Knitting Co.,</u> <u>Inc.</u>, 833 F.2d 1560, 4 USPQ2d 1793, 1798 (Fed. Cir. 1987) and, in regard to the latter, <u>Mushroom Makers, Inc. v. R.G.</u> <u>Barry Corp.</u>, 580 F.2d 44, 199 USPQ 65 (2d Cir. 1978) cert. denied, 439 U.S. 1116, 200 USPQ 832 (1979). On the other hand, merely because we decline to find that applicant adopted its mark in bad faith, it does not follow from this record that applicant has acted entirely in good faith. While the factor does not weigh in the balance against applicant, it does not weigh in its favor either.

### Balancing of Likelihood of Confusion Factors

The dissimilarity of marks can outweigh all other *DuPont* factors and result in a finding of no likelihood of confusion. <u>Kellogg Co. v. Pack'em Enterprises Inc.</u>, 951 F.2d 330, 21 USPQ2d 1142, 1145 (Fed. Cir. 1991). On the other hand, merely because marks are the same or very similar does not dictate that likelihood of confusion must be found, for there are many similar marks that coexist because of use on or in connection with disparate goods or services. Nonetheless, when the marks are virtually identical, as in this case, resolution of a few significant additional *DuPont* factors in favor of the prior registrant and against the newcomer will result in a finding of likelihood of confusion.

44

In this case, we find the fame of opposer's mark a significant factor. Recot, 54 USPQ2d at 1897 ("fame of the prior mark, when present, plays a 'dominant' role in the process of balancing the *DuPont* factors"). Also, while opposer's mark is not registered for goods that are the same as or closely related to those identified in applicant's application, opposer has clearly moved into collateral merchandising and into sponsorship of various sporting events, so that consumers, i.e., the general public, encountering the NASDAQ mark on applicant's goods likely will be confused about their origin or sponsorship. See Philip Morris Incorporated v. K2 Corporation, et al., 555 F.2d 815, 194 USPQ 81, 82 (CCPA 1977) (In a case involving identical marks but where goods were held not "competitive or intrinsically related," the Court affirmed the Board's finding of likelihood of confusion, in part due to association of both parties with skiing events.). Given the renown of opposer's mark, the general public may make decisions regarding the purchase of applicant's goods with less care. See Specialty Brands, 223 USPQ at 1284. Finally, while we do not find in the record conclusive evidence of bad faith adoption of the NASDAQ mark by applicant, neither do we find clear evidence of innocent adoption devoid of intent to capitalize on a well-known term.

45

In summary, the *DuPont* factors we have discussed dictate a finding that there exists a likelihood of confusion. Therefore, we sustain the opposition insofar as it is based on opposer's Section 2(d) claim of ownership of a registration of NASDAQ for stock market services.

**DILUTION**

Apart from its Section 2(d) claim, opposer has also pressed a claim of dilution. The Federal Trademark Dilution Act (FTDA) provides a federal cause of action for the dilution of famous marks, and the Trademark Amendments Act of 1999 (TAA) "requires the Board to consider dilution under the FTDA as a ground for opposition."[26] Enterprise Rent-A-Car Company v. Advantage Rent-A-Car, Inc., __ F.3d __, __ USPQ2d __ (Appeal No.02-1444, slip opinion p. 2) (Fed. Cir. 2003), Toro Co. v. ToroHead Inc., 61 USPQ2d 1164 (TTAB 2001). The FTDA and TAA protect any mark that is both distinctive and famous against use and registration of marks that would lessen the capacity of the famous mark to identify and distinguish the famous mark owner's goods or services. Moseley v. V Secret Catalogue Inc., __ U.S. __, 65 USPQ2d 1801, 1802 (2003).

---

[26] The FTDA, 109 Stat. 985, is codified at Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c), with dilution defined in Section 45, 15 U.S.C. §1127. The TAA, Pub. L. No. 106-43, 113 Stat. 218, is codified in various sections of 15 U.S.C.; but for our purposes, we focus on Sections 2(f), 13 and 14 of the Lanham Act, 15 U.S.C. §§ 1052(f), 1063 and 1064.

The Supreme Court's recent decision in <u>Moseley</u> raises a threshold issue we must address -- as the Federal Circuit did not have occasion to address it in <u>Enterprise</u>, its first FTDA/TAA decision -- before we can consider opposer's claim of dilution. In <u>Moseley</u>, a case involving a civil action under the FTDA, the Court held that a plaintiff must prove actual dilution, not merely a likelihood of dilution. <u>Moseley</u>, 65 USPQ2d at 1807. In this opposition, the involved application is based on Section 44 of the Lanham Act and applicant has not used its mark in the United States or in commerce between Italy and the United States. Accordingly, we can only reach opposer's claim of dilution if we first determine that, in Board proceedings, it is sufficient for a plaintiff to establish likelihood of dilution rather than actual dilution.

We find that there is a distinction to be drawn between civil actions and Board proceedings and that, in a Board proceeding, a plaintiff that establishes its ownership of a distinctive and famous mark may prevail upon a showing of likelihood of dilution. We have already held so in an opposition involving an intent to use application, i.e., a situation in which a plaintiff cannot show actual dilution. See <u>Toro</u>, 61 USPQ2d at 1174 ("an application based on an intent to use the mark in commerce satisfies the commerce requirement of the FTDA for proceedings before the Board.").

47

We now extend the holding to this opposition alleging prospective dilution by a mark not yet in use and that is the subject of a Section 44 application.[27]  Our determination is supported by the Lanham Act.

Congress, despite the existence and recognition of state dilution statutes that permit relief on a showing of likelihood of dilution, fashioned the FTDA to permit relief for the owner of a famous mark only when it could show the newcomer's mark actually causes dilution.  Moseley, 65 USPQ2d 1807.  Moreover, when Congress subsequently passed the TAA, it made no change in the "*causes* dilution" standard applicable in judicial proceedings, yet allowed Board proceedings to be based on a claim that a newcomer's mark "*when* used *would cause* dilution."  Compare 15 U.S.C. §1125(c)(1) and 15 U.S.C. §1052(f) (emphasis added).  Further, the TAA amendment of Section 2(f) of the Lanham Act to allow for dilution claims in Board proceedings specifically refers to Section 13 (oppositions) and Section 14 (cancellations) as the proceedings in which a dilution claim may be raised.  Section 13 allows oppositions by any person "who believes that he *would be* damaged … including as a result of dilution," and Section 14 allows cancellation

---

[27] While applicant's involved application is not based on intent to use but, rather, on Section 44 of the Lanham Act, the Section 44 basis requires applicant to have and expressly state its bona fide intention to use its mark in commerce.  15 U.S.C. §§ 1126(d) and (e).

actions "by any person who believes that he *is or will be* damaged, including as a result of dilution…" (emphasis added). The inescapable conclusion is that Congress intended to limit judicial relief under the FTDA to cases where dilution has already occurred but to allow cases involving prospective dilution to be heard by the Board.[28] We see no holding or statement in <u>Moseley</u> that runs counter to this conclusion.

Having determined that <u>Moseley</u> does not preclude us from deciding opposer's dilution claim, we turn to an assessment of the distinctiveness and fame of opposer's mark. <u>Toro</u> explains that our inquiry into distinctiveness does not end merely because opposer's mark is on the Principal Register and was registered without resort to a claim of acquired distinctiveness, because distinctiveness for dilution purposes requires that the famous mark be "so distinctive that the public would associate the term with the owner of the famous mark even when it encounters the term apart from the owner's goods or services." <u>Toro</u>, 61 USPQ2d at 1177.

While applicant appears to acknowledge that opposer's mark has achieved some degree of fame, it argues that NASDAQ

---

[28] We note, too, that Congress permitted the filing of trademark applications based on intent to use through its passage of the Trademark Law Revision Act of 1988, and that many opposition proceedings involve intent to use applications. See <u>Toro</u>, 61 USPQ2d at 1174.

is not inherently distinctive because it is an acronym formed from the assertedly descriptive phrase "National Association of Securities Dealers Automated Quotation," and because use of acronyms is common in the stock market field. Brief, pp. 5-6.  More specifically, in regard to its first point, applicant cites to authority from the Second Circuit which holds that FTDA protection is available only to inherently distinctive marks and asserts that acronyms, by their very nature, cannot be considered inherently distinctive.

In its reply brief, opposer argues that its registration is incontestable so that its mark's distinctiveness is "conclusively settled"; that applicant's attack on the presumptive distinctiveness of opposer's mark is an impermissible collateral attack; that the registration for its mark is, in any event, immune from attack on the grounds of descriptiveness; and that any claim that the mark is generic would have had to be the subject of a compulsory counterclaim, which applicant did not file.  Reply brief, pp. 1-2.  Thus, before considering applicant's arguments, we consider opposer's contention that the arguments cannot even be heard.

The law, of course, is well settled that an applicant cannot collaterally attack opposer's registration in the absence of a counterclaim for cancellation.  37 C.F.R. §

2.106(b); <u>Contour Chair-Lounge Co. v. The Englander Co.</u>, 324 F.2d 186, 139 USPQ 285, 287 (CCPA 1963) ("[T]his is an opposition only and in an opposition, this court has always held that the validity of the opposer's registrations are not open to [collateral] attack"); <u>Cosmetically Yours, Inc. v. Clairol, Inc.</u>, 424 F.2d 1385, 165 USPQ 515, 517 (CCPA 1970) ("As long as the registration relied upon by an opposer in an opposition proceeding remains uncanceled, it is treated as valid and entitled to the statutory presumptions").  Nonetheless, we do not find applicant to have engaged in an impermissible collateral attack on opposer's registration.

To prevail on its dilution claim, opposer must establish that its mark is not merely famous, but is distinctive.  <u>Toro</u>, 61 USPQ2d at 1177.  The FTDA, made applicable to this opposition by the TAA, provides that one factor to consider, in resolving the question whether a plaintiff's mark is distinctive and famous, is "the degree of inherent or acquired distinctiveness of the mark."  15 U.S.C. §1125(c)(1)(A).  The inquiry is made even when it is undisputed that the plaintiff's mark is validly registered on the Principal Register.  See <u>Toro</u>, <u>supra</u>, wherein the Board considered the degree of inherent or acquired distinctiveness of opposer's mark notwithstanding that it

had been registered on the Principal Register without resort to a claim of acquired distinctiveness.

In view of the fact that a plaintiff pursuing a dilution claim in a Board proceeding must, as an element of its claim, prove the distinctiveness of its mark, and that consideration of such issue requires consideration of the degree of inherent or acquired distinctiveness of the mark without regard to the type of registration the plaintiff owns, we hold that it is permissible for a defendant addressing a dilution claim to present arguments regarding the lack of distinctiveness of the plaintiff's mark, even in the absence of a counterclaim for cancellation of the plaintiff's pleaded registration. We do not see how we can prohibit a defendant from presenting arguments on a factor that the statute specifically delineates as relevant to a dilution inquiry.[29]

Turning to applicant's first argument as to why opposer's mark is not distinctive, i.e., that acronyms per se cannot be inherently distinctive, we note that the authority on which applicant has relied, Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 51 USPQ2d 1882 (2d Cir. 1999),

---

[29] Applicant has argued that opposer's mark lacks distinctiveness only in regard to the dilution claim; and has not done so in contesting opposer's Section 2(d) claim.

establishes no such per se rule, and we decline to create one.[30]

Applicant's second argument as to why opposer's mark is not distinctive is the asserted frequent use of acronyms in the securities field. While applicant did not, at trial, offer any evidence to support this asserted practice, or evidence of the use of the particular acronyms referenced in its brief, we do not discount the argument, for the record does include, at least, references to certain acronyms or initialisms discussed by applicant, e.g., NYSE, AMEX and OTC. Nonetheless, the argument does not undermine our conclusion that opposer's mark is inherently distinctive.

Of course, each mark must be considered on its own merits. Thus, whether another acronym or initialism would be perceived as a non-distinctive abbreviation of a descriptive phrase does not establish that opposer's mark will be perceived as non-distinctive.[31] Opposer's mark is

---

[30] We also note that the Second Circuit, in <u>New York Stock Exchange Inc. v. New York, New York Hotel LLC</u>, __ F.3d __, 62 USPQ2d 1260, 1264-65 (2d Cir. 2002), has reiterated that Circuit's position that relief under the FTDA is available only when the plaintiff's mark is found to be inherently distinctive. The Federal Circuit, our primary reviewing court, has not had occasion to rule on the question of whether a plaintiff bringing a dilution claim in a Board proceeding must own an inherently distinctive mark, or whether it is sufficient if the mark has acquired distinctiveness. Therefore, we proceed on the assumption that a mark with inherent or acquired distinctiveness may be protected under the dilution statute. It is an immaterial point in this case, however, because we find opposer's mark to be inherently distinctive, for reasons discussed herein.

[31] In addition, to the extent that applicant is correct in its observation that use of acronyms is prevalent in the securities

53

an acronym and is spoken as a two syllable word. Opposer's witness (Jacobs) testified that it is the acronym, not the underlying words, that is advertised and promoted by opposer, and the record bears this out. Further, we note that even the reference works of record do not agree on precisely what words are the root of NASDAQ, see footnote 19, infra, so that the one constant is the acronym itself. We find that the NASDAQ acronym is, in effect, a unique word that points to opposer's stock market and is an inherently distinctive mark.

We note that the record does not reveal any use of NASDAQ -- except for the asserted use by applicant in Europe -- by anyone besides opposer. Further, the numerous excerpts from printed publications that have been made of record by opposer's notice of reliance all show NASDAQ as a reference to a particular stock market. On this record, NASDAQ is every bit the type of uniquely distinctive term contemplated by the FTDA.

Turning to the fame of opposer's mark, we have no difficulty finding that NASDAQ is a famous mark. In Toro, the Board held that an opposer pursuing a dilution claim must establish that its mark became famous prior to the filing date of the applicant's application. Toro, 61 USPQ2d

---

field, the practice may actually illustrate that the acronyms are distinctive, insofar as they are identified with particular stock or equity markets.

at 1174.  In addition, the Board stated that establishing fame for dilution purposes is a more rigorous endeavor than establishing fame for a Section 2(d) likelihood of confusion analysis.  Toro, 61 USPQ2d at 1180-81.  In particular, regarding this second point, the Board held that evidence of widespread recognition of a term is required of a dilution plaintiff.  Id. (listing recognition of fame by the other party, intense media attention, and surveys as examples of evidence sufficient to show FTDA fame).  In this case we have evidence meeting both Toro requirements.

First, the record clearly establishes that opposer's mark was famous prior to the filing date of applicant's application.  Although our discussion of the evidence of fame of opposer's mark in connection with the issue of likelihood of confusion reviewed all the evidence of fame, including activities engaged in after applicant's filing date, we reiterate that the record is clear that a great deal of the evidence of fame predates the priority filing date of the involved application.

The second part of the inquiry is whether opposer has established fame under the more rigorous standard required for dilution.  In this connection, even applicant has acknowledged that opposer's mark has achieved some degree of fame, although it can fairly be characterized as admitting no more than fame within the field of investing.  Brief, p.

55

6. Opposer, however, also has shown that its advertising actually resulted in recognition of NASDAQ by approximately three-quarters of investors by mid-1998, if not earlier. The dictionary references, newspaper and magazine articles, and daily reports on opposer's stock market in print and broadcast media evidence very widespread recognition, beyond just investors,[32] and a great deal of this evidence is prior to applicant's priority filing date.

In short, we find that opposer has established that its mark is famous for dilution purposes and that such fame was acquired prior to the priority filing date of applicant's application.

Our final inquiry regarding whether use of applicant's NASDAQ mark for the identified goods would be likely to cause dilution of opposer's mark is whether blurring would occur, so as to lessen the capacity of opposer's mark to identify its stock market services. Moseley, 65 USPQ2d 1807 (state dilution statutes provide that tarnishment and blurring are actionable, while FTDA arguably refers only to the latter).

---

[32] We hasten to add that, while we do not rely solely on recognition of opposer's mark among investors, we do not believe one can reasonably dispute that the portion of the general public "invested" in stocks, whether through ownership of individual securities, mutual funds, employee stock funds, retirement funds, or the like, is a large percentage of the American public.

Moseley suggests that blurring requires one viewing the
newcomer's mark either to conclude that the famous mark is
now associated with a new product or service or to associate
the famous mark with its owner less strongly or exclusively.
Moseley, 65 USPQ2d at 1808. The Board held in Toro that
"blurring occurs when a substantial percentage of consumers,
upon seeing the junior party's use of a mark on its goods,
are immediately reminded of the famous mark and associate
the junior party's use with the owner of the famous mark,
even if they do not believe that the goods come from the
famous mark's owner." Toro, 61 USPQ2d at 1183. The Board
also held that three factors should be considered,
specifically, (1) the similarity of the marks; (2) renown of
the senior party, i.e., the person claiming fame; and (3)
"whether target customers are likely to associate two
different products with the mark even if they are not
confused as to the different origins of these products."
Id.

In this case, we have no difficulty concluding that
dilution would occur, even in the absence of survey evidence
regarding consumer perception.[33] The marks here are
effectively identical and opposer's mark was famous, for

---

[33] "It may well be, however, that direct evidence of dilution such
as consumer surveys will not be necessary if actual dilution can
reliably be proven through circumstantial evidence -- the obvious
case is one where the junior and senior marks are identical."
Moseley, 65 USPQ2d at 1808.

purposes of the dilution claim, prior to the filing date of applicant's application and has increased in renown since then. Finally, in regard to the third <u>Toro</u> factor, we do not believe that prospective purchasers or users of applicant's goods, i.e., the general public, would be likely to associate NASDAQ with another entity besides opposer. Rather, they "would wonder why another party could use a mark that they thought would have identified a unique, singular, or particular source." <u>Toro</u>, 61 USPQ2d at 1184. In <u>Toro</u>, the term common to each party's mark was "Toro," i.e., the Spanish word for bull, and was found to be suggestive in connection with the applicant's goods rather than a unique mark. By contrast, in this case we have a term that is not a common word and is a unique mark. Thus, members of the public familiar with opposer's mark, when encountering it in connection with applicant's goods, would either conclude that it was opposer's mark being used on or in connection with these products or would have to reach a contrary conclusion only by associating the mark less strongly with opposer. Either result would be a blurring and would lessen the capacity of opposer's mark to identify goods and services having their source in opposer. <u>Moseley</u>, 65 USPQ2d at 1808.

We sustain the opposition based on opposer's claim of dilution.

DECISION:  The opposition to registration of applicant's mark is sustained both as to its likelihood of confusion claim based on opposer's registration and as to opposer's dilution claim; and registration to applicant is refused.