**NEW YORK STOCK EXCHANGE, INC., Plaintiff–Appellant,**

v.

**NEW YORK, NEW YORK HOTEL, LLC and New York, New York Hotel & Casino, LLC, Defendants–Appellees.**

Docket No. 99–9276.

United States Court of Appeals, Second Circuit.

Argued: July 10, 2000.

Decided: April 1, 2002.

William R. Golden, Jr., Kelley Drye & Warren LLP, New York, NY; Michelle M. Graham, of counsel; Joseph D. Garon, Doreen L. Costa, Baker & Botts LLP, New York, NY, of counsel, for Plaintiff–Appellant.

Kenneth A. Plevan, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY; Bruce J. Goldner, Scott D. Brown, of counsel; Mark G. Tratos, Quirk & Tratos, Las Vegas, NV, of counsel, for Defendants–Appellees.

Before WALKER, Chief Judge, WINTER, and JACOBS, Circuit Judges.

WINTER, Circuit Judge.

The New York Stock Exchange, Inc. ("NYSE") appeals from Judge Cedarbaum's grant of summary judgment, dismissing its claims for trademark infringement and dilution under the Lanham Act, *see* 15 U.S.C. § 1125, and trademark blurring and tarnishment under New York law, *see* N.Y. Gen. Bus. Law § 360–l. NYSE brought this action against New York, New York Hotel & Casino, LLC (the "Casino") and its corporate predecessor, New York, New York Hotel, LLC, to prevent the Casino's use of physical features and promotional materials based on modified versions of NYSE's marks. Examples of the modified marks include: (i) a replica of NYSE's architectural facade that bore the words "New York New York Stock Exchange" located near the Casino's gambling floor; (ii) the Casino's "New York $lot Exchange" or "New York–New York $lot Exchange" club for frequent gamblers; (iii) sweatshirts, caps, and other souvenirs given out by the Casino to the members of its players club displaying the "New York $lot Exchange" or "New York–New York $lot Exchange" slogan; and (iv) the Casino's reference to its players club by the "NY$E" or "NY–NY$E" abbreviation.

We affirm in part and reverse in part. We hold that summary judgment was properly granted on all of NYSE's Lanham Act infringement claims. We also affirm the dismissal of NYSE's Lanham Act dilution claims as to all but one of its marks on the ground that the NYSE marks, save for the exception, are not inherently distinctive. The exception is a registered logo consisting of the NYSE building's facade bearing the words "New York Stock Exchange." We believe that a trier might find this mark to be inherently distinctive and thus eligible for the Lanham Act's anti-dilution protection. Finally, we affirm the dismissal of NYSE's state law blurring claim but reverse the dismissal of the tarnishment claim.

## BACKGROUND

Because NYSE is appealing from an adverse grant of summary judgment, we view the evidence and draw all reasonable inferences in its favor. *See Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990).

All would concede that NYSE is famous in the business world and beyond. Founded more than two hundred years ago, NYSE operates and manages one of the foremost national and international facilities for the trading of securities. It publicizes financial data about its listed companies and provides other services, such as educational programs about the securities markets. Routine references to NYSE are found in newspapers, television broadcasts, and other media outlets. Every working day, numerous news stories and updates are reported from NYSE's trading floor. NYSE annually receives visits by hundreds of thousands of tourists, many of whom purchase memorabilia bearing NYSE's marks. NYSE itself spends millions of dollars in advertisements every year to protect and enhance its reputation for listing only firms that adhere to rigorous disclosure and governance standards and for transparency and integrity in the use of its facilities to trade securities in those companies. NYSE also engages in promotional activities for its products and services.

Accordingly, NYSE has registered numerous marks with the United States Patent & Trademark Office. These marks include the names "New York Stock Exchange" and "N.Y. Stock Exchange," as well as the abbreviation "NYSE." NYSE has also registered a trademark for a logo spelling out "NYSE" in a stylized form, with thin horizontal lines running across the width of the logo except for the letter "S." Another NYSE-registered logo embodies a picture of the architectural facade of NYSE's building, an historical landmark. This facade consists of a triangular pediment, displaying eleven bas-relief figures, that is supported by six Corinthian columns and topped by an attic. It also contains the words "New York Stock Exchange" on the frieze. It is conceded that NYSE's marks are valid and properly registered.

The Casino operates a hotel and gambling facility located in a part of Las Vegas that is popularly known as the "Las Vegas Strip." Like many other casinos in the surrounding area—such as Caesar's Palace and Treasure Island—the Casino's building and operations are based on a theme, namely the "mood and spirit" of New York City. Consistent with this theme, the Casino features famous "neighborhoods" and notable icons of New York City throughout its interior and exterior decor. For example, various parts of the Casino's grounds are divided and named after famous New York City locales, such as the "Coney Island Emporium" game arcade, the "Greenwich Village" food court, and the "Soho Village" and "Park Avenue" retail shops. Additionally, the Casino has furnished its interior space with subway signs, parking meters, steaming manholes, and other familiar sights of New York City streets.

The Casino's exterior displays an illusion of New York City's skyline by cobbling together the appearances of ten famous Manhattan skyscrapers, including the Empire State Building and the Chrysler Building. The entranceway area of the Casino also contains a 150–foot tall replica of the Statue of Liberty and a 300–foot long replica of the Brooklyn Bridge.

The Casino also has bona fide New York City restaurants such as "Gallagher's Steakhouse," as well as other stores and eateries with fictional, but authentic-sounding, New York City names, including "Greenberg's Deli," "Broadway Burger," and "The Bar at Times Square." Even the change carts used on the Casino's gambling floor—decorated with the looks of "classic" New York City Checker taxi cabs—adhere to the theme.

At the time the Casino opened for business in January, 1997, it also featured references to NYSE, which are the heart of the present dispute. First, the Casino built a replica of NYSE's architectural facade in the Casino's "Financial District," an area on the main gambling floor where the cashiers' cages are located. The replica facade bore the words "New York New York Stock Exchange" in gold letters and was visible to gamblers playing on the Casino's slot machines. The Casino also distributed a press kit at the time of its opening and for several months thereafter that included a photo of the replica facade. As a consequence, pictures of the replica appeared in newspapers and magazines across the country.

Second, the Casino sponsored a players club entitled the "New York $lot Exchange" for frequent gamblers. References to the players club appeared in the Casino's print brochures, its Internet web site, its slot machines, and on a large neon sign. The Casino also used the "New York $lot Exchange" slogan on some souvenir items that it gave out—but never sold—to the members of its players club. Third, the Casino displayed the abbreviation "NY$E" on its slot machines and in

some promotional materials. The Casino has also alternatively used the abbreviation "NY NY$E" to refer to its players club.

After NYSE filed the present action, the Casino voluntarily modified some of its versions of NYSE's marks. For example, the Casino renamed its players club to "New York–New York $lot Exchange." It also replaced some signs advertising the players club, but did not remove the original "New York $lot Exchange" slogan from its slot machines. Additionally, the Casino altered its replica facade to read "New York New York $lot Exchange," thereby exchanging the word "Stock" for "$lot." The replica facade was otherwise unchanged, however. Lastly, the Casino promised to discontinue using the abbreviation "NY$E," though it also expressed its intention to continue using the abbreviation "NY–NY$E."

Upon a motion by the Casino, the district court granted summary judgment against NYSE, dismissing all of its claims. *See New York Stock Exch., Inc. v. New York, New York Hotel, LLC,* 69 F.Supp.2d 479, 494 (S.D.N.Y.1999) (*"NYSE"*). Applying the eight factors of *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.1961), the court held that the Casino did not infringe upon NYSE's marks under the Lanham Act. *See NYSE,* 69 F.Supp.2d at 484–88. The district court then ruled that the Casino did not dilute NYSE's marks for Lanham Act purposes. *See id.* at 488–90. In particular, the district court held that "famous" marks that acquire secondary meaning—such as NYSE's—are not "distinctive" as that term is used in the statute and are thus not entitled to anti-dilution protection. *See id.* Finally, the district court concluded that there was no factual basis supporting liability for either blurring or tarnishment under New York law. *See id.* at 490–93.

## DISCUSSION

■■■ We review the district court's decision to grant summary judgment *de novo. See Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 269 F.3d 114, 118 (2d Cir.2001). Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party has established its right to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.,* 228 F.3d 56, 61 (2d Cir.2000). A dispute is not "genuine" unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

a) *Trademark Infringement under the Lanham Act*

The Lanham Act prohibits the unauthorized "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion." 15 U.S.C. § 1114(1)(a); *see also* 15 U.S.C. § 1125(a)(1). There being no dispute about the lack of NYSE's consent to the use of its marks or their validity, the only issue with regard to infringement is whether the Casino's use of modified versions of NYSE's marks is likely to cause confusion with the actual marks.

■■■ To support a finding of infringement, a plaintiff must show a probability, not just a possibility, of confusion. *See Streetwise Maps, Inc. v. Vandam, Inc.,* 159 F.3d 739, 743 (2d Cir.1998). Confusion exists where there is a "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Mak-*

*ers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978). There can also be confusion where consumers are likely to believe that the challenged use of a trademark is somehow sponsored, endorsed, or authorized by its owner. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204–05 (2d Cir.1979).

██ We apply Judge Friendly's venerated *Polaroid* test to determine whether there is a likelihood of confusion. This test catalogs eight factors that guide deliberation, including: (i) the strength of the plaintiff's trademark; (ii) the degree of similarity between the parties' marks; (iii) the proximity of the products; (iv) the likelihood that the plaintiff will "bridge the gap" between the products; (v) the existence of actual confusion; (vi) the defendant's good faith; (vii) the quality of the defendant's product; and (viii) the sophistication of the consumers. *See Polaroid*, 287 F.2d at 495. Application of the *Polaroid* test is not mechanical, and "no one factor is necessarily dispositive," although "any one factor may prove to be so." *Nora Beverages*, 269 F.3d at 119. The district court's *Polaroid* analysis yielded the conclusion that the "obvious pun" would not cause any confusion among consumers. We agree.

NYSE argues that the district court should have taken into account certain facts that are not expressly encompassed within the eight *Polaroid* factors. NYSE also maintains that the district court erred in its application of the *Polaroid* test by weighing the factors narrowly and in isolation, rather than as a whole. However, these arguments are meritless.

First, NYSE argues that the district court should have considered the possibility that some consumers might encounter the Casino's modified NYSE marks through Internet advertising or direct mail solicitations, without ever having been to Las Vegas. Such distant encounters, it contends, would greatly increase the chance that some such consumers might not comprehend the Casino's humorous (or so intended) modification of the NYSE marks. NYSE's theory, however, is not supported by the evidence. The Casino's Internet web site and brochures exhibit versions of NYSE's marks that are so obviously modified that any viewer would understand that the Casino was engaged in a parody or humorous play on words. Moreover, the advertisements include other playful uses of the New York City theme that would further underline the obvious. For example, the Casino's advertisements include a Las Vegas showgirl dressed as the Statue of Liberty, the Manhattan Express roller coaster, as well as any number of other similar thematic devices.

In this regard, NYSE also contends that the district court should have given weight to the fact that the Casino used some real marks, such as Nathan's Famous Frankfurters, which the Casino had been licensed to use, with its modified versions of NYSE's marks. NYSE argues that the licensed use of real marks makes it more likely that some consumers might mistake the modified NYSE marks for the real things. However, given the lack of any subtlety in the modified versions of NYSE's marks used by the Casino, this concern cannot be seriously credited. Even a visitor aware of the Casino's use of some genuine marks could not miss the elaborate parody in the Casino's theme.

Second, the district court did not evaluate the *Polaroid* factors too narrowly or otherwise incorrectly by giving great weight to the humorous play on words in the Casino's use of the modified NYSE marks. NYSE contends that the district court did not give due weight to the strength of its marks. However, the strength of NYSE's marks does not neces-

sarily increase the likelihood of confusion under these circumstances. *See Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 502–03 (2d Cir.1996). Indeed, viewed within the context of the Casino's theme, it is highly unlikely that anyone would misunderstand the Casino's attempt at a humorous theme because it actually "depends on a lack of confusion to make its point." *Id.* at 503. We thus find no error in the district court's emphasis on the Casino's "obvious pun."

Additionally, even if the strength of NYSE's marks somehow altered the balance in its favor, the other *Polaroid* factors, viewed collectively, would still support the district court's conclusion. There is no evidence that NYSE and the Casino compete directly in any market or that NYSE plans to "bridge the gap" by entering the casino business. Nor is there evidence that the Casino acted in bad faith in the sense of deceiving consumers about the relationship of its product to NYSE.[1] *See Streetwise Maps,* 159 F.3d at 745. Indeed, even the least-sophisticated consumers would understand and detect humor in the Casino's theme. Finally, NYSE concedes that there is a lack of plausible evidence of more than *de minimis* actual confusion caused by the Casino's modified use. *See Nora Beverages,* 269 F.3d at 123–24.

b) *Trademark Dilution under Lanham Act*

■ The Lanham Act allows the owner of a famous trademark to seek "an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1). To obtain relief, a trademark owner must show that its mark is both famous and distinctive. *See Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 215 (2d Cir.1999). This is because "[a] mark that, notwithstanding its fame, has no distinctiveness is lacking the very attribute that the antidilution statute seeks to protect." *Id.* at 216. Put another way, "[t]here can be no dilution of a mark's distinctive quality unless the mark is distinctive." *Id.*

■ A trademark can be distinctive for purposes of *infringement* analysis if it either is inherently distinctive or has acquired distinctiveness through secondary meaning. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). However, the district court held that the scope of the Lanham Act's anti-*dilution* protection extends only to those marks that are inherently distinctive, not to those that derive distinctiveness only from secondary meaning. *See NYSE,* 69 F.Supp.2d at 488–89. Finding that all of NYSE's marks are as a matter of law not inherently distinctive, albeit famous, the court dismissed NYSE's federal dilution claims. NYSE argues that the marks are distinctive for Lanham Act dilution purposes, even if they are not inherently distinctive, because they have acquired secondary meaning.

At the time of the parties' briefings and oral argument, the issue of whether dilution protection under the Lanham Act extends to marks that are not inherently distinctive but that have acquired second-

---

1. NYSE argues that summary judgment on its infringement claims was improper because of the existence of evidence of the Casino's bad faith. That evidence is the admission of the Casino's officers that they were aware of NYSE's marks before they proceeded to use their own modified versions. However, there is no evidence that the Casino acted in bad faith in any sense relevant to the Lanham Act, that is, by deceiving consumers into believing that its products or services were related to NYSE. *See Streetwise Maps,* 159 F.3d at 745; *Hormel,* 73 F.3d at 505.

ary meaning had not yet been settled in this circuit. Since then, we have agreed with the district court's reasoning. *See TCPIP Holding Co. v. Haar Communications Inc.*, 244 F.3d 88, 98 (2d Cir.2001). In *TCPIP*, we ruled that: "Because TCPIP's mark, 'The Children's Place,' as a designator of stores for children's clothing and accessories, is descriptive, and thus, lacks inherent distinctiveness, it cannot qualify for the protection of the Dilution Act. The mark's deficiency in inherent distinctiveness is not compensated by the fact that TCPIP's mark has achieved a significant degree of consumer recognition." *Id.* We follow that decision.

■ We also agree with the district court that NYSE's marks, with one exception, have, as a matter of law, only acquired, rather than inherent, distinctiveness. Most of the marks combine in one fashion or another a geographic term with a generic term, or the initials thereof, and are thus descriptive rather than suggestive, arbitrary, or fanciful. *See Nabisco*, 191 F.3d at 215–16. The exception is NYSE's logo with its facade. The district court concluded that NYSE's architectural facade was not distinctive because many other well-known buildings, such as the United States Supreme Court building and the Brooklyn Museum, employ a similar design. *See NYSE*, 69 F.Supp.2d at 489. We think that this logic is flawed. "A mark is arbitrary ... if there is no logical relationship whatsoever between the mark and the product on which it is used." *Nabisco*, 191 F.3d at 216. This principle seems applicable to NYSE's architectural logo. A stock exchange can be housed in any of a variety of buildings, and the use of a combination of particular architecture with the New York Stock Exchange name might be found by a trier of fact to be rather arbitrary. *See Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 585 (2d Cir.1993); *Charles of the Ritz Group Ltd. v. Quality King Distribs., Inc.*,

832 F.2d 1317, 1321 (2d Cir.1987). Such an image is certainly neither generic nor descriptive of a stock market.

Because NYSE's mark consisting of its architectural facade and name is inherently distinctive, or so a trier of fact might find, *see Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir. 1976), we remand this claim to the district court for further proceedings.

c) *The New York Law Claims*

■ New York law provides that a "[l]ikelihood of ... dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief ... notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." N.Y. Gen. Bus. Law § 360–l. Unlike our ruling as to the Lanham Act in *TCPIP*, New York law accords protection against dilution to marks that are distinctive as a result of acquired secondary meaning as well as to those that are inherently distinctive. *See Allied Maint. Corp. v. Allied Mech. Trades, Inc.*, 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162, 1166 (1977) (discussing N.Y. Gen. Bus. Law § 368–d, the current law's predecessor). There is no dispute in this case that NYSE's marks are all distinctive, either, in the case of the logo, perhaps inherently so or, in the case of that and the other marks, because they have acquired secondary meaning. Accordingly, the only question is whether there is a likelihood of dilution. *See Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 42 (2d Cir.1994).

■ Dilution under New York law can involve either blurring or tarnishment. *See Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1031 (2d Cir.1989). In granting summary judgment, the district court held that no reasonable finder of fact could conclude in

NYSE's favor on either its blurring or tarnishment claims. *See NYSE*, 69 F.Supp.2d at 491, 492–93. We agree as to blurring but disagree as to tarnishment.

■ Blurring occurs "where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Deere & Co.*, 41 F.3d at 43 (emphasis omitted). To determine the likelihood of blurring, we have looked to six factors, including: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark. *See Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 966 (2d Cir.1996); *Deere & Co.*, 41 F.3d at 43 n. 8. Although we realize that infringement and blurring differ in important respects, we believe that on the facts presented here, our discussion of infringement also disposes of the blurring claim. The humor or parody in the Casino's use of the modified NYSE marks depends upon the fact that the Casino is not claiming to be associated with NYSE, albeit the Casino seeks to emphasize that it too offers possible profits and certain risks. There is therefore no diminution of the capacity of NYSE's marks to serve as a unique identifier of its products and services. Consequently, the grant of summary judgment was proper.

■ For similar reasons, we believe that summary judgment was inappropriate on NYSE's tarnishment claim. Tarnishment occurs where a trademark is "linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context," with the result that "the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Id.* at 43.

The district court held that NYSE cannot sustain a theory of tarnishment against the Casino because NYSE had already associated itself with many other casinos and gambling businesses by listing them on the Exchange. *See NYSE*, 69 F.Supp.2d at 492–93. As an example, the district court pointed out an advertisement by Rio Hotel & Casino, Inc., proclaiming its participation in NYSE's market. *See id.* at 492.

However, this reasoning misses the mark. To be sure, NYSE lists some casinos on the Exchange, but this kind of association might be deemed by a trier of fact to be meaningfully different from the association suggested by the Casino's use of the modified NYSE marks. The listing of companies relates solely to NYSE's role as a pricing and financial monitoring intermediary, not as an associate engaged in the underlying commercial activity of listed firms.

In contrast, the Casino's use of the modified NYSE marks might well be viewed by a trier of fact at the very least as drawing an analogy, albeit humorous, between its business and that of NYSE. NYSE in turn wants to preserve a reputation for listing companies that adhere to its rules for accounting, disclosure, and management and are therefore safer investments than are companies that need not abide by such rules. NYSE would also like to preserve a reputation for integrity and transparency in the trading conducted on its floor. A reasonable trier of fact might therefore find that the Casino's humorous analogy to its activities—deemed by many to involve odds stacked heavily in favor of the house—would injure NYSE's reputation. As we have stated before, "tarnishment is not limited to seamy conduct." *Hormel*, 73 F.3d at 507. Summary judgment was therefore not proper.

## CONCLUSION

For the reasons indicated above, the district court's decision is affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion. Each party shall bear its own costs.