George **DERIENZO**, Plaintiff,

v.

**METROPOLITAN TRANSPORTATION AUTHORITY and Metro–North Commuter Railroad, Defendants.**

No. 01 Civ. 8138(PKL).

United States District Court, S.D. New York.

March 9, 2010.

The Maurer Law Firm PLLC, Ira M. Maurer, Esq., Fishkill, NY, for Plaintiff George DeRienzo.

Hoguet Newman Regal & Kenney, LLP Brian C. Dunning, Esq., Ira J. Lipton, Esq., New York, NY, for Defendants Metropolitan Transportation Authority and Metro–North Commuter Railroad.

### OPINION AND ORDER

LEISURE, District Judge:

Plaintiff, George DeRienzo, brings this action against defendants, Metropolitan Transportation Authority and Metro–North Commuter Railroad pursuant to the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51–60, alleging personal injuries sustained as a result of a hazardous condition in defendants' workplace. Specifically, plaintiff alleges that while working as a MTA police officer he slipped on debris that had collected at the top of a staircase and subsequently fell down the flight of stairs, injuring his back. After his alleged fall, plaintiff underwent back surgery, which caused, according to plaintiff, a previously undiagnosed tumor to hemorrhage, or become "apoplectic." Plaintiff claims that defendants violated FELA's requirement that an employer provide its employees a safe workplace by failing to exercise reasonable care in informing and protecting him from the debris that had collected on the staircase.

Defendants previously moved for summary judgment on the grounds that plaintiff's alleged accident was not foreseeable within the meaning of the FELA statute, and that plaintiff had failed to demonstrate that his alleged injuries were caused by the fall. This Court granted defendants' motion as to the issue of forseeability. *Derienzo v. Metro. Transp. Auth.*, 404 F.Supp.2d 555, 566–67 (S.D.N.Y.2005). Because foreseeability is a necessary element of all of plaintiff's claims, this Court did not address defendants' arguments concerning causation. *Id.* at 567. On June 20, 2007, the Second Circuit held that disputed questions of material fact exist as to the issue of forseeability and, therefore, it was inappropriate for this Court to grant summary judgment as to this issue. *DeRienzo v. Metro. Transp. Auth.*, 237 Fed. Appx. 642, 646 (2d Cir.2007). The Second Circuit further held that, on remand, this Court should consider whether summary judgment is appropriate on the issue of causation. *Id.* at 646–47.

The parties submitted supplementary briefing to address issues raised by the Second Circuit's June 20, 2007, ruling. Defendants chose not to revisit the Second Circuit's determination that summary judgment is not appropriate on the issue of forseeability. *See id.* at 646. Therefore, whether plaintiff's injuries were reasonably foreseeable remains a genuine issue of material fact. While defendants initially moved for summary judgment on causation as to (1) plaintiff's back injuries, and (2) plaintiff's pituitary apoplexy allegedly caused by his back surgery, defendants now have limited their renewed motion for partial summary judgment on causation solely to the issue of plaintiff's pituitary apoplexy allegedly caused by his back surgery.[1] (*See* Def.'s Mem. of Law in Sup. of Summ. J. ("Def.'s Mem.") 1 n. 1.) For the

---

**1.** This Court's 2005 summary judgment ruling in favor of defendants was grounded on plain-

reasons stated below, defendants' motion for partial summary judgment is granted.

## BACKGROUND

### I. *Plaintiff's Injuries*

Plaintiff was hired by defendant Metro–North as a police officer in 1991, and retired with a disability pension on October 9, 2002. (Def.'s Local Rule 56.1 Statement ("Def.'s 56.1") ¶ 1.) Plaintiff claims that, while on duty on September 8, 1998, he slipped and fell down a flight of steps located at Oak Street on Metro–North property in Mount Vernon, New York (the "Steps"). (*Id.* ¶ 3.) Plaintiff was placed on injury leave by Metro–North from September 8, 1998, until November 10, 1998. (*Id.* ¶ 6.) In November 1998 plaintiff was deemed qualified to return to work, and he remained on full active duty until the following March. (*Id.* ¶ 7.) Plaintiff alleges that defendants were negligent in the maintenance and design of the Steps thereby causing his fall and subsequent injuries. (*Id.* ¶ 3.)

Plaintiff claims that the fall down the Steps caused injuries to his back that ultimately required him to undergo back surgery. (*Id.* ¶¶ 3, 8.) Plaintiff's May 4, 1999, back surgery (the "May 4 Surgery") was performed by Dr. Damon DelBello. (*Id.* ¶¶ 3, 8, 13–14.) Dr. DelBello performed the May 4 Surgery from the anterior aspect—the front of plaintiff's body—using a technique that involved an incision in the abdomen, expansion of the abdomen with gas, and the use of a device that allowed the surgeons to see and operate on plaintiff's spine. (*Id.* ¶ 14; Pl.'s Local Rule 56.1 Statement of Additional Material Facts ("Pl.'s. 56.1 Add.'l") ¶ 1.) While he was recovering from surgery, plaintiff developed a headache, experienced visual disturbances, and began to have difficulty moving his eye. (Def.'s 56.1 ¶ 16.) On May 5, 1999, CT and MRI scans revealed that plaintiff had a large, previously undiagnosed tumor on his pituitary gland, and that this tumor had become apoplectic (or hemorrhaged). (*Id.*) Plaintiff underwent an emergency operation, during which most of the tumor was removed by Dr. Harold Pikus. (*Id.* ¶ 16–17.)

Plaintiff claims that his May 4 Surgery caused his tumor to hemorrhage, and that the hemorrhaging tumor caused a number of serious injuries, including permanent brain damage and cognitive dysfunction. (Pl.'s 56.1 Add.'l ¶¶ 17–18; Pl.'s Mem. of Law in Opp.'n to Summ. J. ("Pl.'s Mem.") 4–8.) Plaintiff further claims that in the absence of the May 4 Surgery his tumor would have been discovered before it hemorrhaged. (Pl.'s 56.1 Add'l. ¶ 18.)

### II. *Plaintiff's Theory of Causation*

In support of his theory that the May 4 Surgery caused his tumor to hemorrhage,

tiff's failure to file a counterstatement to defendants' Local Rule 56.1 statement of material facts. In support of the current renewed motion for partial summary judgment, defendants have filed a renewed Local Rule 56.1 statement of material facts, and plaintiff has now filed both a Local Rule 56.1 counterstatement to these material facts and a statement of additional material facts that he claims are not in dispute. No objection has been raised to plaintiff's submission of these statements, and the Court has considered these statements in rendering the current decision. As plaintiff has now submitted a Local Rule 56.1 counterstatement of material facts, and a statement of additional material facts, there is no need for this Court to decide, as the Second Circuit directed, whether there is a potential conflict between Local Rule 56.1 and Federal Rule of Civil Procedure 56 when a party fails to file a Local Rule 56.1 statement. *See DeRienzo v. Metro. Transp. Auth.*, 237 Fed. Appx. 642, 647 (2d Cir.2007). Furthermore, in light of the well-developed record on the specific issues addressed by this renewed motion for partial summary judgment, the Court notes that it has undertaken its own thorough review of the record in deciding this motion. *See id.* at 646–47; *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir.2001).

plaintiff relies primarily on the testimony of Dr. Pikus, the neurosurgeon who performed the operation to remove his tumor. Plaintiff supplements Dr. Pikus's opinion with testimony from Dr. David Blum, an endocrinologist who began to treat plaintiff after his May 4 Surgery, and Drs. DeBello and Cristofaro, physicians who treated plaintiff's back injury.

According to plaintiff, there are three general reasons why pituitary tumors become apoplectic, all of which are related to events that can occur during surgery. (*Id.* ¶ 8.) The first reason a pituitary tumor may become apoplectic during surgery is if a patient experiences a significant drop in blood pressure. (*Id.;* Pl.'s Mem. 5.) A drop in blood pressure may cause capillaries near the tumor to cease to function due to an insufficient amount of oxygen and nutrients. (Pl.'s 56.1 Add.'l ¶ 8; Pl.'s Mem. 5.) When the patient's blood pressure returns to its normal level, the dead capillaries can burst, causing the tumor to become apoplectic. (Pl.'s 56.1 Add.'l ¶ 8; Pl.'s Mem. 5.) The second reason is if a patient's blood pressure becomes too high during surgery, blood vessels running through a pituitary tumor may burst, causing the tumor to hemorrhage. (Pl.'s Mem. 5.) Finally, plaintiff contends that a pituitary tumor may become apoplectic due to "congestion of the blood" caused by the use of gas to expand a patient's abdomen during surgery. (*Id.*)

Plaintiff concedes that Dr. Pikus "cannot say which of the three mechanisms caused" his pituitary apoplexy. (Pl.'s 56.1 Add.'l ¶ 11.) However, plaintiff maintains that Dr. Pikus is able to conclude within a reasonable degree of medical certainty "that one of the three mechanisms ... almost certainly led to the hemorrhage within [ ] [plaintiff's] [p]ituitary gland." (*Id.;* Pl.'s Mem. 6–7.)

Plaintiff contends that Dr. Pikus's opinion that the May 4 Surgery caused his apoplexy is based on a differential diagnosis. (Pl.'s Mem. 6.) Plaintiff asks the Court to accept Dr. Pikus's opinion that plaintiff's pituitary apoplexy was caused by his back surgery based on this differential diagnosis. (*Id.* 9–16.) Plaintiff maintains that the close temporal proximity between his May 4 Surgery and the identification of the tumor lends further support to Dr. Pikus's conclusion that the May 4 Surgery was what caused the apoplexy. (*Id.* 11–12.) Plaintiff offers the opinions of three other treating physicians, Drs. Blum, DelBello and Crisofaro, that focus on the short period of time between the May 4 Surgery and the discovery of plaintiff's apoplectic tumor as evidence that the May 4 Surgery caused his apoplexy. (*See* Pl.'s Mem. 11–15.)

Plaintiff relies on a case study entitled "Pituitary Apoplexy Following a Lumbar Spine Stabilization," authored by Dr. Pikus, to support the theory that the May 4 Surgery was what caused the apoplexy. (Pl.'s Counter 56.1 ¶ 29.) In the case study, which details plaintiff's diagnosis and treatment, Dr. Pikus notes that the "retraction and ligation of various blood vessels in the [course of back surgery] and possibly other hemodynamic changes caused by the surgery" may have caused the apoplexy. (Lipton Decl. Ex. 9 (Case Study) at 3.) However, the case study is clear that "[c]ompromise of blood flow [during surgery] is not the only mechanism [ ] theorized as [a] possible cause [ ] behind the development of pituitary apoplexy" and that there are a number of alternative possibilities for why the tumor became apoplectic, including hypertension, head trauma, coughing, or sneezing. (*Id.* at 3–4.) The case study notes that "there are no reported cases of pituitary apoplexy following a herniated lumbar disc repair" and that "[f]urther work-up of the patient is necessary to see if any of [the identified] risk factors may have been the catalyst in

the development of the pituitary apoplexy; perhaps the workup will ultimately show that the development of the syndrome in this patient was a spontaneous and unhappy coincidence." (*Id.* at 4.)

Defendants do not challenge the general credentials of plaintiff's proposed expert witnesses. Rather, it is defendants' position that Dr. Pikus's testimony is unclear concerning the cause of plaintiff's apoplexy, and that any conclusions reached by Dr. Pikus, or plaintiff's other treating physicians, are unreliable and inadmissible. More specifically, defendants argue that the opinions of Dr. Pikus and plaintiff's other treating physicians are not the product of an acceptable differential diagnosis because the physicians neither "ruled in" plaintiff's surgery as a possible cause of his apoplexy, nor did they "rule out" numerous other possible causes of the apoplexy that are unrelated to the May 4 Surgery. (*See* Def.'s Reply Mem. in Supp. Of Summ. J. ("Def.'s Reply") 3–8.) While defendants apparently concede that there is a temporal connection between plaintiff's back surgery and the discovery of his apoplexy, defendants argue that an expert opinion based on temporal proximity alone is insufficient to establish causation. (*See id.* at 8–10.)

## DISCUSSION

### I. *Standard of Review*

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). "The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.,* 432 F.3d 428, 433 (2d Cir.2005) (quoting *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.,* 391 F.3d 77, 83 (2d Cir.2004)); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (Kearse, J.). "If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." *Westinghouse Credit Corp. v. D'Urso,* 278 F.3d 138, 145 (2d Cir.2002); *accord Brown v. Cara,* 420 F.3d 148, 152 (2d Cir.2005) ("We will affirm the District Court's grant of summary judgment to defendants only if, based on facts not in genuine dispute and drawing all inferences in favor of plaintiffs, defendants are entitled to judgment on the merits as a matter of law."). "A dispute as to a material fact is 'genuine,' and hence summary judgment is not appropriate, under this standard, only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Lang v. Ret. Living Publ'g Co.,* 949 F.2d 576, 580 (2d Cir.1991) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *accord N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel LLC,* 293 F.3d 550, 554 (2d Cir.2002).

### II. *The Federal Employers' Liability Act*

Plaintiff's claims are brought pursuant to the Federal Employers' Liability Act ("FELA"), which provides that: Every common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of

such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51. To prevail in a FELA action, "the plaintiff must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation." *Tufariello v. Long Island R.R.*, 458 F.3d 80, 87 (2d Cir.2006). However, "the plaintiff's burden in making a showing of causation and negligence is lighter under FELA than it would be at common law because 'the theory of FELA is that where the employer's conduct falls short of the high standard required of him by the Act and his fault, in whole or in part, causes injury, liability ensues.'" *Id.* (quoting *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 438–39, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958)); *see also Williams v. Long Island R.R.*, 196 F.3d 402, 406 (2d Cir.1999) ("[A] relaxed standard of negligence applies in FELA cases in this Circuit."); *Sinclair v. Long Island R.R.*, 985 F.2d 74, 76–77 (2d Cir. 1993) (McLaughlin, J.) (stating that "there is a considerably more relaxed standard of proof for determining negligence in FELA cases" than in other negligence cases) (citations omitted).

 The relaxed standard of proof in a FELA action does not alter the requirement that when "an injury has multiple potential etiologies, expert testimony is necessary to establish causation." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46–47 n. 7 (2d Cir.2004) (interpreting the Jones Act, "which incorporates FELA by reference"); *see also Nealy v. U.S. Surgical Corp.*, 587 F.Supp.2d 579, 586 (S.D.N.Y.2008) ("'Expert medical opinion evidence is usually required to show the cause of an injury or

disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person.'" (quoting *Barnes v. Anderson*, 202 F.3d 150, 159 (2d Cir.1999))); *cf. Tufariello*, 458 F.3d at 88 (holding that expert testimony is not needed to establish causation when "there is a generally understood causal connection between physical phenomena . . . and the alleged injury that would be obvious to laymen") (citations omitted).[2] Summary judgment is proper if a party fails to provide admissible, necessary expert testimony on causation. *See Amorgianos v. Amtrak*, 303 F.3d 256, 271 (2d Cir.2002) ("[I]n the absence of any expert evidence as to general causation and a gap in plaintiffs' case . . . defendant was entitled to summary judgment because of plaintiffs' failure to present any admissible evidence in support of their theory of causation.").

### III. *Standard For Admissibility of Expert Evidence*

 "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir.2007); *see also Baker v. Urban Outfitters, Inc.*, 254 F.Supp.2d 346, 353 (S.D.N.Y.2003) (Preska, J.) ("The proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence."). The relaxed standard of proof applicable to FELA actions does not alter the requirement that expert testimony meet the standards set forth in Federal Rule of Evidence 702. *See Amerada Hess Corp.*, 379 F.3d at 47 ("[T]he standards for determin-

---

2. Neither party suggests that causation can be established in this case absent expert testimony. The Court agrees that determining what caused a tumor to hemorrhage is not the type

of injury that would be "obvious to laymen," *Tufariello*, 458 F.3d at 88, or "within the sphere of the common knowledge of the lay person" *Nealy*, 587 F.Supp.2d at 586.

ing the reliability and credibility of expert testimony are not altered merely because the burden of proof is relaxed."); *Campbell v. CONRAIL,* No. 05 Civ. 1501, 2009 WL 36889, at *1–2, 2009 U.S. Dist. LEXIS 810, at *3–4 (N.D.N.Y. Jan. 6, 2009); *Higgins v. Consol. Rail Corp.,* 06 Civ. 0689, 2008 WL 5054224, at *1, 2008 U.S. Dist. LEXIS 94889, at *2 (N.D.N.Y. Nov. 21, 2008).

Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* "interpreted Rule 702 to require district courts to act as gatekeepers by ensuring that expert scientific testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *In re Fosamax Prod. Liab. Litig.,* 688 F.Supp.2d 259, 267, 2010 WL 330220, at *7 (S.D.N.Y.2010) (Keenan, J.) (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592–93, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). On the issue of reliability, "*Daubert* enumerated a list of factors that, while not constituting a 'definitive checklist or test,' a district court might consider in evaluating whether a proffered expert opinion has the required indicia of scientific reliability," including: "whether a theory or technique had been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards

existed to govern the theory or technique's application or operation." *Nimely v. City of N.Y.,* 414 F.3d 381, 396 (2d Cir.2005) (quoting *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786); *see also Ruggiero v. Warner–Lambert Co.,* 424 F.3d 249, 253 (2d Cir. 2005).

■ When, such as here, a plaintiff seeks to establish causation through the use of an opinion from a treating physician, the "opinion on causation 'is subject to the same standards of scientific reliability that govern the expert opinions of physicians hired solely for purposes of litigation.'" *Flemings v. Merck & Co. (In re Fosamax Prods. Liab. Litig.),* No. 06 Civ. 7631, 2009 WL 4042769, at *6 n. 4, 2009 U.S. Dist. LEXIS 109366, at *18 n. 4 (S.D.N.Y. Nov. 23, 2009) (Keenan, J.) (quoting *Turner v. Iowa Fire Equip. Co.,* 229 F.3d 1202, 1207 (8th Cir.2000)).

■ Plaintiff asserts that his treating physicians employed a differential diagnoses in concluding that the May 4 Surgery caused his tumor to hemorrhage. (*See* Pl.'s Mem. 9–12.) "A differential diagnosis is a patient-specific process of elimination that medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes." *Ruggiero,* 424 F.3d at 254 (citation and internal quotation marks omitted). When an expert relies on a differential diagnoses to " 'rule out' other potential causes for the injury at issue, he must also 'rule in' the suspected cause, and do so using scientifically valid methodology." *Id.* (citations omitted); *see also In re Fosamax Prods. Liab. Litig.,* 688 F.Supp.2d at 267–69, 2010 WL 330220, at *7–8. "While an expert need not rule out every potential cause in order to satisfy *Daubert,* the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defen-

dant." *In re Fosamax Prods. Liab. Litig.*, 688 F.Supp.2d at 268, 2010 WL 330220, at *8 (quoting *Israel v. Spring Indus.*, No. 98 Civ. 5106, 2006 WL 3196956, at *5, 2006 U.S. Dist. LEXIS 80863, at *20 (E.D.N.Y. Nov. 3, 2006)).

■ A district court "has broad discretion in determining whether in a given case a differential diagnosis is enough by itself" to prove causation. *Ruggiero*, 424 F.3d at 254. However, an expert's opinion should be grounded in more than the mere temporal proximity between a plaintiff's symptoms and the alleged cause of the symptoms. *See Washburn v. Merck & Co.*, No. 99-9121, 2000 WL 528649, at *2, 2000 U.S.App. LEXIS 8601, at *5 (2d Cir.2000) (affirming exclusion of expert testimony as unreliable where the conclusion that defendant's vaccine caused plaintiff's injuries "was based on little more than temporal correlation between [plaintiff's] vaccination and the onset of symptoms"); *Spring Indus.*, 2006 WL 3196956, at *5, 2006 U.S. Dist. LEXIS 80863, at *21 (excluding expert testimony on causation where sole justification for the opinion was "a temporal correlation between the onset of [plaintiff's] symptoms and the presence of the alleged cause.").

## IV. *Application*

### A. Dr. Pikus

Dr. Pikus is a board certified neurosurgeon who currently practices medicine in North Carolina. (*See* Maurer Aff. Ex. 1 (Deposition of Dr. Harold Pikus ("Pikus Dep.")) at 10.) Dr. Pikus was not present during plaintiff's May 4 surgery. Rather, Dr. Pikus's treatment of plaintiff began on the day that plaintiff was brought to the Westchester Medical Center for emergency surgery to remove his apoplectic tumor. (*See id.* at 10–11.)

#### 1. Dr. Pikus's Testimony

At his deposition, Dr. Pikus testified "that the back surgery was probably what caused [plaintiff's] pituitary tumor to hemorrhage." (*Id.* at 32.) When asked to explain the basis for his conclusion, Dr. Pikus stated that "nobody really knows why in any particular circumstance a hemorrhage occurs" but that there are "three general reasons" why a tumor may hemorrhage, including: a significant loss of blood pressure during surgery; a significant rise in blood pressure during surgery; and "congestion of the blood" due to pumping a patient's abdomen full of gas during the surgery. (*Id.* at 33–36.) Dr. Pikus admitted that he had no prior personal experience with a tumor that had hemorrhaged due to lower back surgery and that while "[i]t's infrequent" and occurs in "[p]robably about two percent" of cases, he has personally observed tumors that have hemorrhaged "without the insult of surgery." (*Id.* at 37, 72.)

Dr. Pikus did not directly connect any of the "three general reasons" he identified for why a tumor can hemorrhage during surgery to the particular circumstances of plaintiff's case. During his deposition, Dr. Pikus reviewed an anesthesiologist's record of plaintiff's May 4 Surgery. (*See id.* at 66–71.) The anesthesiologist's record documents a number of plaintiff's vital signs throughout the course of his May 4 Surgery. While Dr. Pikus declined to speculate as to plaintiff's normal blood pressure, Dr. Pikus testified that it appeared that plaintiff's blood pressure dropped during the course of the surgery. (*See id.* at 69–70.) However, Dr. Pikus explicitly refrained from drawing any conclusions from these records, stating that he is "not an expert in understanding the blood pressure requirements of a particular individual" and that he "really can't give [ ] an expert's opinion" on whether the apparent drop in plaintiff's blood pressure during surgery was enough of a drop to cause his tumor to hemorrhage, "because

it's not [his] area of expertise." (*Id.* at 69–71.)

Dr. Pikus published a case study based on his treatment of plaintiff. (*See id.* at 73–76.) Prior to the publication of this case study, Dr. Pikus was not aware of any other published reports of lower back surgery causing a pituitary tumor to hemorrhage. (*See id.* at 78–79.) In his case study, Dr. Pikus provided a summary of plaintiff's health condition and the process that led to the identification of the pituitary tumor. (*See* Case Study at 2.) In discussing the diagnosis and treatment of the tumor, Dr. Pikus noted that plaintiff suffers from hypertension and obesity and that these conditions may have been contributing factors to the tumor becoming apoplectic. (*See id.* at 3.) Dr. Pikus detailed other research that has found that:

risk factors for the development of pituitary apoplexy include, edema, positive pressure ventilation, changes in intracranial pressure, like those that occur during a lumbar puncture or even caused by coughing and sneezing, hypertension . . . bleeding disorders, anticoagulant therapy, radiation therapy, diabetes mellitus and diabetic ketoacidosis, head trauma, shock, Sheehan's syndrowm, estrogen therapy, bromocryptine therapy, [and] changes in arterial pressure, such as those that occur in carotid arteiography.

(*Id.* at 4.) Dr. Pikus noted that a possible cause of the apoplexy may be plaintiff's May 4 Surgery, but that "these are mere speculations, as there are no reported cases of pituitary apoplexy following a herniated lumbar disc repair" and that "[f]urther work-up of this patient is necessary to see if any of these risk factors may have been the catalyst in the development of the pituitary apoplexy; perhaps the workup will ultimately show that the development of the syndrome in this patient was a spontaneous and unhappy coincidence." (*Id.*)

## 2. The Admissibility of Dr. Pikus's Testimony

■ There is no evidence that Dr. Pikus engaged in a differential diagnosis, or any other admissable scientific process, before concluding that plaintiff's May 4 Surgery was what caused his tumor to hemorrhage. Plaintiff, therefore, has failed to meet his burden of proving that Dr. Pikus's testimony is sufficiently reliable under Rule 702 and *Daubert.*

Plaintiff does not explain what specific methodology Dr. Pikus used to "rule in" plaintiff's May 4 Surgery as the cause of his apoplexy. Plaintiff is correct that the lack of any published reports of a pituitary tumor becoming apoplectic due to lower back surgery is not necessarily fatal to Dr. Pikus's testimony. *See Amorgianos,* 303 F.3d at 266 (noting that there is no requirement that an expert "back his or her opinion with published studies that unequivocally support his or her conclusions"). However, in the absence of scientific literature, Dr. Pikus does not explain what specific methodology he used to come to the conclusion that the May 4 Surgery caused plaintiff's tumor to become apoplectic. Dr. Pikus identified three "general reasons" why a pituitary apoplexy may occur—all of which relate to events that could occur during surgery—but Dr. Pikus could not pinpoint which of these three possibilities actually caused plaintiff's pituitary apoplexy. Rather, at his deposition, Dr. Pikus explicitly avoided discussing what occurred during plaintiff's May 4 Surgery, stating that he "can't give [ ] an expert's opinion" on whether a possible drop in plaintiff's blood pressure was enough to cause the tumor to hemorrhage. (Pikus Dep. at 70–71.)

Even more significant is that Dr. Pikus identified, but failed to exclude, alternative causes of plaintiff's apoplexy that are unrelated to his May 4 Surgery. In Dr. Pikus's case study, which plaintiff relies on as evidence that Dr. Pikus's opinion is based on a reliable scientific method, Dr. Pikus identified a number of possible alternative causes of plaintiff's apoplexy, including "that the development of the syndrome in this patient was a spontaneous and unhappy coincidence." (Case Study at 4.) Dr. Pikus's failure to "address [the identified] alternative causes and provide a reasonable explanation for dismissing" them renders his testimony inadmissible. *In re Fosamax Prods. Liab. Litig.*, 688 F.Supp.2d at 268, 2010 WL 330220, at *8 (quoting *Spring Indus.*, 2006 WL 3196956, at *5, 2006 U.S. Dist. LEXIS 80863, at *20).

While not raised by the parties, the Court is aware of authority supporting the position that a failure on the part of a treating physician to rule out all possible causes of an injury goes to the weight, rather than the admissibility, of the opinion. *See Green v. McAllister Bros., Inc.*, No. 02 Civ. 7588, 2005 WL 742624, at *13, 2005 U.S. Dist. LEXIS 4816, at *40–41 (S.D.N.Y. Mar. 25, 2005) ("[T]o the extent that ... physicians do not fully consider and rule out all possible causes, such deficiencies generally go to the weight of the evidence, not admissibility, and weighing the evidence is a function for the jury." (quoting *Figueroa v. Boston Sci. Corp.*, 254 F.Supp.2d 361, 366 (S.D.N.Y.2003))) (citations omitted); *but see Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir.2001) ("A medical expert's opinion based upon differential diagnosis normally should not be excluded because the expert has failed to rule out every possible alternative cause of a plaintiff's illness.... However, a differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot

provide a reliable basis for an opinion on causation. Thus, if an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony.") (citations omitted); *In re Fosamax Prods. Liab. Litig.*, 2009 WL 4042769, at *7–8, 2009 U.S. Dist. LEXIS 109366, at *22–24 (holding that testimony from a treating physician is inadmissible because, among other failures, the physician failed to rule out known potential causes of plaintiff's injuries); *Munafo v. Metro. Transp. Auth.*, Nos. 98 Civ. 4572, 2003 WL 21799913, at *18–20, 00 Civ. 0134, 2003 U.S. Dist. LEXIS 13495, at *55–59 (E.D.N.Y. Jan. 22, 2003) (excluding expert opinion on causation from a treating psychopharmacologist, and holding that "[i]n lieu of any conscientious attempt to rule out [identified] alternative factors, [the proposed expert's] causation determination barely rises above mere speculation and cannot meet the reliability standards of expert testimony under *Daubert*.").

In this case, Dr. Pikus did not simply fail to fully consider and rule out *all* possible causes of plaintiff's injuries; rather, he failed to rule out *any* possible alternative causes of plaintiff's apoplexy. Dr. Pikus affirmatively identified a wide-range of potential causes of plaintiff's apoplexy, and stated that "[a] more thorough evaluation of the patient would be needed to follow up on these possibilities." (Case Study at 3.) Nonetheless, without any indication that "a more thorough evaluation" was conducted, Dr. Pikus managed to conclude that the May 4 Surgery caused the apoplexy. Admitting such an opinion would run afoul of the important gatekeeping function of this Court. *See, e.g., Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158–59, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (Scalia, J., concurring) ("[T]rial-court discretion in choosing the manner of testing expert reli-

ability [ ] is not discretion to abandon the gatekeeping function .... [or] to perform the function inadequately. Rather, it is discretion to choose among *reasonable* means of excluding expertise that is *fausse* and science that is junky."); *Amorgianos,* 303 F.3d at 265 ("[T]he Supreme Court has made clear that the district court has a 'gatekeeping' function under Rule 702—it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" (quoting *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786)).

Plaintiff suggests that the close temporal relationship between his May 4 Surgery and the discovery of his apoplectic tumor supports Dr. Pikus's opinion on causation. (*See* Pl.'s Mem. 11–13.) It may be true that, in appropriate circumstances, a temporal relationship between two events can serve as one aspect of a more thorough differential diagnosis. *See, e.g., Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 158 (3d Cir.1999) ("when the temporal relationship is strong *and is part of a standard differential diagnosis,* it would fulfill many of the *Daubert/Paoli* [*In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717 (3d Cir.1994) ] factors.") (emphasis added). However, Dr. Pikus's opinion on causation in this case is not the product of an acceptable differential diagnosis as he neither "ruled in" the May 4 Surgery as the cause of plaintiff's injuries nor did he "rule out" other possible causes of plaintiff's injuries that are unrelated to the May 4 Surgery. Standing alone, the temporal proximity between plaintiff's injury and the proposed cause of his injury is insufficient to satisfy the requirements of Rule 702. *See Washburn,* 2000 WL 528649, at *2, 2000 U.S.App. LEXIS 8601, at *5 (holding that "the district court did not abuse its discretion in determining that plaintiff's expert testimony was unreliable because it was based on little more than temporal correlation between [plaintiff's] vaccination and

the onset of symptoms."); *In re Fosamax Prod. Liab. Litig.,* 2009 WL 4042769, at *7–9, 2009 U.S. Dist. LEXIS 109366, at *22–26 (finding proposed expert testimony on causation to be "derived from a 'subjective belief' rather than from scientific knowledge and methodologies" when the expert provided "no other reasoning for his diagnosis other than the temporal relationship and 'a little hum in the medical and dental community' regarding the alleged link between [defendant's product] and [plaintiff's injury]."); *Spring Indus.,* 2006 WL 3196956, at *6, 2006 U.S. Dist. LEXIS 80863, at *21–22 (excluding testimony where expert "based his opinion on what he viewed as a temporal correlation between the onset of [plaintiff's] symptoms and the presence of the alleged cause.").

For the foregoing reasons, the Court finds that Dr. Pikus's opinion that Plaintiff's May 4 Surgery caused his pituitary apoplexy is inadmissible.

**B. Dr. Blum**

█ Dr. David Blum is a board certified endocrinologist who began to treat plaintiff after surgery was performed on his pituitary tumor. (Blum Aff. ¶¶ 2–3.) For purposes of this motion, plaintiff claims that Dr. Blum has offered an opinion that the May 4 Surgery caused plaintiff's tumor to hemorrhage because Dr. Blum submitted a sworn affidavit and testified at his deposition that: 1) because "the [p]ituitary apoplexy appears to have taken place at the time of Mr. DeRienzo's back surgery," and because of the timing of plaintiff's cognitive dysfunction and memory loss, it is his medical opinion that plaintiff's cognitive injuries were caused by the "bleed out of the [p]ituitary tumor during the spine surgery"; and 2) "while it is not possible to explain the exact cause of the pituitary apoplexy, it is well known that a patient can lose blood and/or sustain

a loss of blood pressure during surgery and that either of these events can lead to [p]ituitary apoplexy in people with [p]ituitary tumors." (Blum Aff. ¶¶ 12–13; Pl.'s Mem. 7.)

Defendants argue that to the extent that Dr. Blum has offered an opinion on causation, that opinion is inadmissible, as it is based solely on the temporal relationship between plaintiff's back surgery and the discovery of his apoplectic tumor. (Def.'s Reply 8–9.) The Court agrees. There is no indication that Dr. Blum's conclusions are based on anything but the temporal proximity between plaintiff's May 4 Surgery and the discovery of his apoplexy.[3] Further, Dr. Blum stated that in most cases, pituitary apoplexy is "spontaneous" and "not triggered by anything," and that "we don't know the cause in those cases." (Blum Dep. 6 7.) Dr. Blum does not explain the apparent inconsistency between his belief that in most instances a pituitary apoplexy is spontaneous and his opinion that, in this case, the apoplexy did not occur spontaneously.

To the extent that Dr. Blum speculates that a loss of blood pressure or a loss of blood during surgery could cause a tumor to hemorrhage, he, like Dr. Pikus, did not connect this possible cause of plaintiff's injuries with what actually occurred during plaintiff's surgery. (See Blum Dep. 70 (stating that he did not "know whether or not there was a drop in blood pressure during the course of [plaintiff's] back surgery.")) Plaintiff's lack of evidence as to specific causation provides an independent basis for summary judgment. See Amerada Hess Corp., 379 F.3d at 46 ("In a case such as this, where an injury has multiple etiologies, expert testimony is necessary to establish causation . . . .").

## C. Drs. DelBello and Cristofaro

Drs. DelBello and Cristofaro are orthopedic surgeons who have treated plaintiff on numerous occasions. (See Pl.'s Mem. 8; Def.'s 56.1 ¶ 8.) The only opinion as to causation that DeRienzo seeks to offer from Drs. DeBello and Cristofaro is that, based on "the close temporal relationship between the completion of [plaintiff's] back surgery and the onset of his" symptoms of pituitary apoplexy, DeRienzo's "pituitary apoplexy was caused by his extensive back operation." (Pl.'s Mem. 15; Pl.'s Add.'l 56.1 ¶ 6.) As is the case with DeRienzo's other proposed experts, this conclusory opinion is inadmissible to prove causation. See In re Fosamax Prods. Liab. Litig., 2009 WL 4042769, at *7, 2009 U.S. Dist. LEXIS 109366, at *21 ("A strong temporal relationship between the injury and its alleged cause may be one of several factors considered by a medical doctor to reliably determine causation, but, standing alone, relying wholly on a temporal relationship is not sound scientific methodology that is admissible under Rule 702 and Daubert.").

## D. Lack of Expert Testimony

Plaintiff has failed to provide admissible expert testimony to support his claim that the May 4 Surgery caused his pituitary apoplexy. Without this necessary testimony, there is no genuine issue of material fact as to causation, and summary judgment is warranted. See, e.g., In re Rezulin Prods. Liab. Litig., 441 F.Supp.2d 567, 579 (S.D.N.Y.2006) (Kaplan, J.) (rejecting proposed expert testimony and granting summary judgment based upon plaintiff's failure to offer admissible evidence of causation).

---

3. In fact, Dr. Blum agreed during his deposition that his "belief that the pituitary tumor was affected by the back surgery is based upon the temporal relationship between the back surgery and the pituitary apoplexy." (Blum Dep. 70–71.)

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment on the limited issue of whether plaintiff's May 4 Surgery caused his pituitary apoplexy is GRANTED. The parties are directed to appear in Courtroom 18B on April 8, 2010, at 11:00 a.m. for a pre-trial conference.

**SO ORDERED.**